# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-DP-01104-SCT

*MARLON LATODD HOWELL a/k/a MARLON COX*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 3/30/2001 |
| TRIAL JUDGE: | HON. R. KENNETH COLEMAN |
| COURT FROM WHICH APPEALED: | UNION COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DUNCAN L. LOTT |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:   JUDY T. MARTIN |
| | MARVIN L. WHITE, JR. |
| | JOANNE M. McLEOD |
| | JERROLYN M. OWENS |
| DISTRICT ATTORNEY: | JAMES M. HOOD, III |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 10/23/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

## PROCEDURAL HISTORY

¶1.    Marlon Latodd Howell (Howell) was indicted along with Curtis W. Lipsey (Lipsey) and

Adam Ray (Ray) for capital murder arising from the slaying and attempted robbery of Hugh

David Pernell (Pernell) in New Albany, Mississippi.  Howell was tried and convicted of capital

murder in the Union County Circuit Court.  The jury determined that Howell should suffer the

penalty of death by lethal injection. Howell's subsequent motion for a new trial was denied. Howell perfected his appeal to this Court after being allowed to proceed in forma pauperis.

## FACTS

¶2. Pernell, a retired postal worker, worked as a newspaper carrier for the <u>Tupelo Daily Journal</u>. On May 15, 2000, Pernell was delivering newspapers when he was flagged down by another vehicle sometime after 5:00 a.m. Howell, Ray and Lipsey were in the other vehicle. Howell approached Pernell's driver's side window and shot Pernell. Pernell's vehicle hit a parked vehicle in a nearby driveway. Howell, Ray and Lipsey fled the scene.

¶3. The murder occurred in front of the home of Charles Rice (Rice). At the time, Rice was up watching television and getting ready for work. David Grisham (Chief Grisham), New Albany Police Chief, investigated Pernell's murder and spoke with Rice. Rice had observed the exchange. Rice testified that he looked out his window when he heard a horn blowing. He observed the two vehicles stop in front of his house. Rice testified that a man got out of the passenger's side of the rear vehicle and walked between the two vehicles up to the driver's side of the front vehicle. A conversation ensued, and then the man pulled out a pistol and shot the driver. The shooter then jumped back and got into the rear vehicle which had pulled up to pickup the shooter. Rice testified that he called 911. Rice described the shooter as a young black male, early twenties, clean cut, short hair, approximately six feet tall, light complexion. Rice described the rear vehicle as a dark-colored, late model Oldsmobile based upon the insignia in the middle of the tail lights. Later on May 15, 2000, Chief Grisham received an anonymous telephone call suggesting that he question Lipsey. Chief Grisham left a message for Lipsey to contact the police. Lipsey and Ray voluntarily went to the police station where

2

they were interviewed by Officers Tim Kent (Officer Kent) and Chief Grisham. Based on the statements made by Lipsey and Ray, Chief Grisham began looking for Howell.

¶4.     Howell was arrested at approximately 7:30 p.m. on May 15, 2000, and questioned by Officer Kent and Chief Grisham. Howell stated that he did not know anything about the shooting. Howell claimed that he was in Corinth with a woman at the time of the murder.

¶5.     Brandon Shaw (Shaw) testified that on May 14, 2000, he rode around with Lipsey and Ray. They picked up Howell. When Howell got into the vehicle, he stated that he needed money to pay his probation officer.[1] The four then drove to Tupelo. While stopped at a gas station, Howell observed a man in the parking lot and stated "there goes an easy lick." After returning to New Albany, Howell, Lipsey, Ray and Shaw sat around at Shaw's house for a few hours talking. Shaw's brother, Quinton Shaw (Quinton), and his girlfriend, Andrea, were also at the house but in a bedroom. Howell, Lipsey and Ray left together around 4:00 a.m. in Ray's grandmother's car. They all returned together around 5:30 a.m.

¶6.     Marcus Powell (Powell), who lived in Blue Mountain, had arrived at Shaw's home around 5:10 a.m. and had gone to sleep on the couch. Earlier that evening, Powell had used Quinton's Chevy Lumina. On cross-examination, Powell testified that he was awakened by Howell, Lipsey and Ray returning to Shaw's house. Powell saw them go back to Shaw's bedroom. Howell was wearing a green shirt that evening, and he had a green shirt wrapped around his hand when he returned to the house. Ray came back to the living room and sat down. Powell never saw a gun.

---

[1]  At the sentencing phase of trial, Officer Nance testified that a probationer had to pay a $25 monthly supervision fee and an extra $10 if a probationer fails a drug test.

¶7.     Shaw testified that his cousin, Ray, came back to his bedroom, knocked on the door and stated that "Howell had shot somebody." Shaw came out of his bedroom and saw Howell in the living room with a green shirt wrapped around his hand. Howell asked Shaw to drive him home. Shaw asked his brother to borrow his Chevy Lumina to carry Howell home to Blue Mountain. Powell also wanted a ride home to Blue Mountain.

¶8.     While Shaw went to borrow Quinton's car keys, Howell, Ray and Lipsey had already gone outside. Howell still had the green shirt around his hand. Shaw testified that he carried Powell home first and then dropped Howell off at his house.

¶9.     Shaw then dropped off Lipsey and Ray.[2] When Shaw returned home, he discovered a gun in his backyard. Shaw convinced Lipsey and Ray to go with him to the police later that day to report what had happened. Officer Kent went behind Shaw's house and discovered a gun in the weeds in the backyard. Shaw testified that the gun was lying on top of a bag in the bushes when Officer Kent came to retrieve it.

¶10.    Lipsey testified that he was with Howell when he shot Pernell. On the evening of May 14, 2000, Lipsey was with Shaw and Ray when they picked up Howell to go to Tupelo. According to Lipsey, Howell indicated that he needed money to pay his probation officer. While in Tupelo, Howell spotted a man outside at a payphone at a convenience store. Howell stated that the man would be "a good lick."

¶11.    Lipsey further testified that after leaving Shaw's house, he was in the car with Ray and Howell when Howell reached over and blinked the vehicle's lights at another vehicle trying to make it stop. Howell got out of the vehicle trying to make the other vehicle stop. Howell then

---

[2]  Ray had returned his grandmother's car before they left for Blue Mountain.

4

went over to the other vehicle and began fighting with the man for about half a minute. Howell pulled a gun and shot the man. Howell then jumped back into the vehicle and went back to Shaw's house with Lipsey and Ray. Lipsey testified that Howell told them that the man sprayed him in the face with mace, so he shot him.

¶12. According to Lipsey, Howell woke Shaw when they got to Shaw's house. Lipsey testified that he and Ray remained in the living room while Howell went to get Shaw. Shaw carried Powell home first and then dropped off Howell. Lipsey saw Howell take a Wal-Mart sack out of the vehicle and put the gun in the sack. Lipsey did not know what Howell did with the gun.

¶13. Lipsey testified that he went with Shaw and Ray to the police station later that day. He made two statements to the police. For his participation in Pernell's murder, Lipsey pled guilty to manslaughter and armed robbery, receiving a sentence of twenty years and ten years, respectively, to run consecutively.

¶14. Powell testified that on May 14, 2000, he initially arrived at Shaw's house around 8:00 p.m. Ray was already at Shaw's house when he arrived. Ray and Shaw left together to pick up Howell and Lipsey. All four returned to Shaw's house. Powell testified that Howell stated that he needed to pay his probation officer or he was going to be locked up. Shaw, Howell, Ray and Lipsey all left Shaw's home around 11:00 p.m. Powell borrowed Quinton's vehicle to go to Pontotoc.

¶15. Powell returned to Shaw's house in New Albany around 5:10 a.m. Powell was asleep on the couch when Howell, Lipsey and Ray came back to Shaw's house. Ray sat on the couch beside him. Howell went back to Shaw's bedroom. Powell testified that Shaw used Quinton's

5

vehicle to carry Howell and him home to Blue Mountain. Powell never saw Howell with a gun, but Howell had a green shirt wrapped around his hand. Powell testified that it was the same green shirt Howell had been wearing earlier. Powell was dropped off at his home first.

¶16. Dr. Steven Hayne (Dr. Hayne), state pathologist, conducted the autopsy on Pernell's body. Dr. Hayne testified that Pernell died from a gunshot wound. The bullet entered the chest cavity and traveled from Pernell's front left side through the body on an essentially horizontal plane without deviation up or down and then traveled from front to back at approximately 40 to 50 degrees. Once the bullet entered the chest cavity, it fractured the fourth left rib. The bullet traveled through the left lung and the two chambers of the heart. After the bullet traveled through the left ventricle and the left atrium, it went through the aorta. The bullet left the heart and traveled from the aorta to enter the right lung. The bullet struck the 7th posterior right rib on the right flank, fracturing that bone before it came to rest. ¶17. The bullet caused extensive internal bleeding. There were one and one half quarts of blood in the right chest cavity, approximately one and one half quarts of blood in the left chest cavity, and one cup of blood in the structure that holds the heart's pericardial sac. Dr. Hayne testified that blood displacement of that magnitude would create irreversible shock that would cause death without immediate medical intervention. Dr. Hayne estimated that irreversible shock would have occurred within five to ten minutes.

¶18. Dr. Hayne retrieved the bullet and transported it under a chain of custody to the Mississippi State Crime Lab in Jackson to the firearms division for analysis. Dr. Hayne concluded the manner of death to be homicide due to a gunshot wound. On cross-examination, Dr. Hayne testified that there was no evidence of a struggle, lacerations, contusions or

6

scratches. However, on redirect, Dr. Hayne testified that he could not preclude the possibility of a struggle, only that there was no evidence of a struggle.

¶19.    Starks Hathcock (Hathcock), a forensic scientist specializing in firearms identification with the Mississippi Crime Lab, performed a ballistics examination on the gun recovered from Shaw's residence, the bullet retrieved by Dr. Hayne, and the cartridge case recovered from the crime scene. Hathcock fired and retrieved bullets fired from the Larcin .380 caliber handgun recovered from Shaw's residence to compare to the bullet recovered from Pernell's body. Hathcock examined the class characteristics and individual characteristics to that firearm. Hathcock concluded that the .380 caliber handgun recovered and submitted to the crime lab was the firearm that fired the bullet recovered from Pernell. To examine the recovered cartridge case, Hathcock compared the cartridge case to the markings on the breach case of the firearm. Hathcock found that the markings on the cartridge case bore class characteristics consistent with the firearms, but he did not find specific characteristics consistent with that firearm to positively include or exclude it as being fired from that gun.

¶20.    On appeal, Howell raises the following issues for consideration by this Court:

> **I.**    **Whether the trial court erred in denying a change of venue.**
>
> **II.**    **Whether the trial court erred in denying Howell access to county funds in order to employ an investigator, a jury consultant, a daily transcript, and additional counsel to assist with his defense.**
>
> **III.**    **Whether the trial court erred in failing to quash the jury panel.**
>
> **IV.**    **Whether the trial court erred in finding that the State's use of peremptory strikes did not violate *Batson*.**

V.    Whether the trial court erred in denying Howell's request for individual sequestered voir dire.

VI.    Whether the trial court erred in limiting Howell's voir dire examination.

VII.    Whether the trial court erred in admitting Rice's eyewitness identification testimony.

VIII.    Whether the trial court erred in admitting Howell's statement.

IX.    Whether the trial court erred in allowing witnesses to testify as to statements that Howell made.

X.    Whether the trial court erred in allowing Shaw to testify as to statements made by co-defendant, Ray.

XI.    Whether the trial court erred in refusing to allow Howell to re-cross-examine Shaw after the State's re-direct examination.

XII.    Whether the trial court erred in denying Howell's request for a directed verdict.

XIII.    Whether the trial court erred in granting the State's instruction S-2, which referred to attempted robbery; and whether Mississippi Code Annotated, Section 97-3-19 does not specifically enumerated attempted robbery as an underlying offense for conviction of capital murder.

XIV.    Whether the trial court erred in granting the State's instruction S-6 which did not instruct the jury on simple murder and manslaughter; and whether the trial court erred in denying Howell's instructions D-13 and D-18 on the crime of simple murder and manslaughter.

XV.    Whether the trial court erred in denying instruction D-3 on the weight of the evidence.

XVI.    Whether the trial court erred in denying instruction D-8 on the jury's consideration of testimony of a law enforcement officer.

XVII.          Whether the trial court erred in denying instruction D-16 as to cross-racial eyewitness identification.

XVIII.         Whether the trial court erred in denying Howell's motion for a mistrial and renewed motion for change of venue based upon a juror's father allegedly sitting on front row of audience with victim's family.

XIX.    Whether the trial court erred in allowing the district attorney, in closing argument, to refer to Howell's failure to tell somebody about his alibi defense or give details.

XX.          Whether the trial court erred in denying a twenty-four (24) hour "cooling off" period before the jury considered sentencing.

XXI.    Whether the trial court erred in the sentencing phase by allowing evidence of Howell's previous conviction for possession of marijuana as an aggravating factor.

XXII.          Whether the trial court erred in the sentencing phase by allowing evidence of fees due from Howell during his probation as double use of the same robbery element and pecuniary gain element in the guilt and sentencing phase.

XXIII.          Whether the trial court erred in the sentencing phase by allowing the introduction of the indictment against Howell on a charge of sale of controlled substance, marijuana.

XXIV.          Whether the trial court erred in granting sentencing instruction S-2 because it allegedly removed the issue of sympathy and mercy from consideration by the jury, improperly listed aggravating factors of imprisonment and pecuniary gain, and failed to instruct the jury on how to properly weigh mitigating factor against aggravating facts and define what mitigating and aggravating factors are.

XXV.          Whether the trial court erred in denying Howell's sentencing instruction.

XXVI.          Whether the trial court erred in the sentencing phase by allowing the district attorney to refer to the victim, Pernell,

9

his work, his loss, and what Pernell might say if he were still alive.

**XXVII.** Whether the trial court erred in denying Howell's post-trial motion for a new trial.

**XXVIII.** Whether the imposition of the death penalty is excessive or disproportionate in this case.

## DISCUSSION

### I. Change of Venue

¶21. Howell contends that the trial court erred by denying his request for a change of venue. Howell's motion was supported by six newspaper articles: (1) dated May 16, 2000, from the Tupelo Daily Journal, which described the crime, victim, and community reaction, but did not name Howell; (2) dated May 31, 2000, from the Tupelo Daily Journal, which reported on a totally separate crime and briefly referred to this crime, but did not name Howell; (3) dated May 17, 2000, from the Tupelo Daily Journal, which reported on the arraignment of the three co-defendants and the details of the crime, contained pictures of the three co-defendants, and stated that the court appearance was emotional for the victim's family and the defendants' families; (4) dated May 17, 2000, from the Southern Sentinel, which reported the details of the crime; (5) dated May 17, 2000, from the New Albany Gazette, which reported the details of the crime and contained pictures of the victim and the three co-defendants and was re-run on May 19, 2000; and (6) dated May 19, 2000, from the New Albany Gazette, which reported on the details of the crime, funeral preparations, and community reaction.

¶22. Additionally, Howell submitted seven identical brief affidavits, which stated that Howell could not receive a fair and impartial trial in Union County. Howell also introduced a

10

videotape of a WTVA television newscast. Although Howell did not submit his own affidavit, as statutorily required, the trial court allowed Howell to state in the record his desire for a change of venue.

¶23. The State called four witnesses to testify in response to Howell's motion: (1) Tom Cooper (Cooper), Chancery Clerk of Union County; (2) Danny Barnes (Barnes), Second District Supervisor of Union County; (3) Thomas Stanford (Stanford), retired Circuit Clerk of Union County; and (4) Norman Treadway (Treadway), Fourth District Supervisor of Union County. Each witness testified that Howell could receive a fair and impartial trial in Union County.

¶24. Specifically, Cooper testified that in his capacity as chancery clerk he dealt with a wide assortment of people from all over Union County. Prior to becoming chancery clerk, Cooper had worked at the Union Grocery Company and served as Mayor of New Albany. Cooper stated that he considered himself to be fairly well informed as to what is happening in the county. Cooper testified that until he was contacted about testifying, it had been several months since he had heard anything about Howell's case. Cooper had not personally heard anybody threaten Howell, express ill will towards Howell or prejudice towards his case.

¶25. Barnes testified that he had lived in Union County for thirty-six years and knew a lot of people in the county both inside and outside of the second district. Before becoming a supervisor, Barnes had served as a policeman, a deputy sheriff and a constable. As a member of the Board of Supervisors, Barnes testified that he had continuous dealings with people in the county and considered himself to be a well-informed resident of Union County. Barnes did not recall any media coverage concerning Howell's case since the days immediately

11

following Pernell's death. Barnes did not believe that Pernell was well known within the county outside of New Albany. He had not heard any ill will expressed toward Howell by people in his district.

¶26. On cross-examination, Barnes testified that after Pernell's murder had first occurred, he had heard some comments within New Albany like "they shouldn't be given a trial." On redirect, Barnes testified that he believed that because of his law enforcement experience, people would be more likely to ask him about the case or talk to him about the case. However, people in his district had not talked to him about the case. No one had expressed to him any opinion about how this case should "turn out."

¶27. Stanford testified, that as the former circuit clerk for Union County, he dealt with a wide assortment of people and continued to stay in contact with people all over the county. At the time of the incident, people were concerned about the case and there was news coverage. However, several days following Pernell's death, there was very little news coverage. Stanford had not seen any newspaper articles in the last month before trial or any recent news coverage. Stanford also testified about his experience as circuit clerk and that the jury pool is selected randomly from the county's list of registered voters.

¶28. On cross-examination, Stanford testified that he had heard people express sympathy for both the Pernell and Howell families. He knew Howell's father, Reverend James Howell (Rev. Howell), and thought a lot of the family. Stanford heard that Howell was on probation for a drug-related offense when the incident occurred, but he could not testify as to whether people out in the county had heard about a drug conviction.

12

¶29. Treadway testified that he had been a supervisor in the eastern part of Union County since 1982. Initially there was some news coverage concerning Pernell's death, but Treadway had not read anything about it in the last two months before trial. Treadway heard very little mention of Pernell's death in his part of the county. As supervisor for nineteen years, Treadway knew a lot of people in Union County. Treadway had not heard anyone express any ill will toward Howell or prejudgment of the case.

¶30. The decision to grant a venue change rests in the sound discretion of the trial judge. *Hoops v. State*, 681 So.2d 521, 526 (Miss. 1996); *Johnson v. State*, 476 So.2d 1195, 1208 (Miss. 1985); *Winters v. State*, 473 So.2d 452, 457 (Miss. 1985); *Cabello v. State*, 471 So.2d 332, 339 (Miss. 1985). This Court will not disturb the ruling of the trial court where the sound discretion of the trial judge in denying a change of venue was not abused. *Burrell v. State*, 613 So.2d 1186, 1190 (Miss. 1993); *Harris v. State*, 537 So.2d 1325, 1328 (Miss. 1989); *White v. State*, 495 So.2d 1346, 1349 (Miss. 1986).

¶31. In *Davis v. State*, 767 So.2d 986, 993 (Miss. 2000), this Court held that "[a] motion for change of venue 'must be in writing and supported by affidavits of two or more credible persons showing that the defendant cannot receive an impartial and fair trial in that particular county because of prejudgment of the case or grudge or ill will to the defendant in the mind of the public.'" (citing *Hoops*, 681 So.2d at 526).

¶32. The right to a fair trial by an impartial jury is guaranteed by both the federal and state constitutions. *Johnson*, 476 So.2d at 1208 (citing U.S. Const. Amend. VI and Miss. Const. art. 3, § 26)). "The accused has a right to a change of venue when it is doubtful that an impartial

13

jury can be obtained." *Davis*, 767 So.2d at 993 (citing *White*, 495 So.2d at 1348). "[U]pon proper application, there arises a presumption that such sentiment exists; and, the state then bears the burden of rebutting that presumption." *Johnson*, 476 So.2d at 1211.

¶33. This Court enumerated "certain elements which, when present would serve as an indicator to the trial court as to when the presumption is irrebutable." *White*, 495 So.2d at 1349. The elements are as follows:

(1)   capital cases based on considerations of a heightened standard of review;
(2)   crowds threatening violence toward the accused;
(3)   an inordinate amount of media coverage, particularly in cases of
    (a)   serious crimes against influential families;
    (b)   serious crimes against public officials;
    (c)   serial crimes;
    (d)   crimes committed by a black defendant upon a white victim;
    (e)   where there is an inexperienced trial counsel.

*Id*.; *Davis*, 767 So.2d at 993-94; *Baldwin v. State*, 732 So.2d 236, 241 (Miss. 1999); *Burrell*, 613 So.2d at 1189-90.

¶34. In the case sub judice, Howell filed a motion for a change of venue accompanied by seven affidavits. He claims that the "alleged murder [of Pernell] evokes great passion and prejudice in this community." Howell's motion contended that a jury empaneled in a case of an assaultive crime by blacks against whites in Union County, a largely rural, small county with a majority white population, would follow a "long tradition" of convicting "on almost any evidence to serve as a deterrent to blacks." Howell's motion stated that the people of a largely rural county such as Union County would "naturally have fears and apprehensions of murder cases." The trial court conducted a hearing on Howell's motion for change of venue. Howell

testified at the change of venue hearing that he thought that he could not receive a fair trial in Union County.

¶35. The State then had the burden of rebutting the presumption. *See **Johnson***, 476 So.2d at 1211. In support of its position, the State called the four witnesses, Cooper, Barnes, Stanford and Treadway, to testify. None of the State's witnesses testified to having any knowledge of any grudge or ill will toward Howell, threats against Howell or prejudgments of the case. Within the last months prior to trial, none of the State's witnesses had heard any publicity about the case. The State rested and Howell offered no additional evidence to support his position. The trial court withheld ruling on the change of venue motion until it could review a tape of a newscast and transcript of the newscast prepared by WTVA offered by the defense and the affidavits filed to support Howell's motion. In denying Howell's motion for change of venue, the trial court stated, "having considered the affidavits and exhibits filed on behalf of the defendant and the testimony presented the [c]ourt finds that the State has overcome the presumption raised by the filing of the affidavits seeking change of venue...."

¶36. Given the facts surrounding this issue, we find that Howell did not demonstrate an abuse of discretion by the trial court's denial of the motion for change of venue. There was no evidence offered of any threatened violence towards Howell, nor an inordinate amount of media coverage. The testimony of the State's witnesses demonstrated that Howell could receive a fair trial. Upon the conclusion of testimony from the State's witnesses, Howell offered no additional evidence to rebut the State's witnesses and support his motion.

¶37. Finally, Howell did not present any evidence that he could not or did not receive a fair trial from twelve jurors who heard his case. Because a large number of the venire panel had

15

read about the case in the newspaper, the trial judge questioned the entire panel to determine whether anyone had formed or expressed an opinion concerning the guilt or innocence of Howell based on anything they may have read, heard or seen in the media. The trial court informed the venire panel that if they had not already responded to the trial court's prior questions concerning media coverage, they must respond at that time if anything they had read, heard or seen would affect their decision. The trial court informed the panel that their responses were being made under oath. No venire member responded that they had formed or expressed an opinion as to Howell's guilt. No venire member expressed that they had any personal knowledge of the case or had been pressured by anyone on how to vote. "The linchpin is whether the venire members stated that they could be fair and impartial jurors if chosen." *Simon v. State*, 688 So.2d 791, 803 (Miss. 1997). Based on the evidence in the record, we find that the trial court did not abuse its discretion in denying the motion for change of venue. Accordingly, this issue is without merit.

## II.    Failure to Grant Howell County Funds For His Defense

¶38.    Howell contends that the trial court erred in denying funds for his defense to hire: (1) an investigator; (2) a jury consultant; (3) limited daily transcripts; (4) additional counsel; and (5) additional psychiatric evaluation. At trial, Howell did not proceed as a pauper and accordingly he did not have court-appointed counsel. Howell's attorney was retained and chose to handle the case on a pro bono basis as a favor to Howell's father.

### A.  Investigator

¶39.    Terry Cox (Cox) conducted an investigation on Howell's behalf. Rev. Howell testified that Cox was employed and compensated from donations received from friends. Cox testified

16

that his investigation was limited due to available funds. Howell's family was having trouble paying for his services. Cox had primarily been able to interview the State's witnesses, but he was not able to conduct any investigation into any possible mitigating issues. The trial court denied Howell's motion for funds for an investigator. The trial court stated that:

> The court is of the opinion that there has not been any showing that the defendant has been or is being denied a fair opportunity to present [its] defense based on what the court has before it.

This issue is without merit.

### B. Jury Consultant

¶40. Howell further contends that the trial court erred in denying his request for a jury consultant. Rev. Howell testified that he did not have the funds available to hire a jury consultant to help pick Howell's jury. As pastor of Bethlehem Baptist Church in Tippah County for approximately twenty years, Rev. Howell did not have much contact with people outside of his church. Furthermore, Howell's attorney asked the trial court to take notice that he was not from Union County; and therefore, he would not be familiar with a venire panel drawn from Union County. On cross-examination, Rev. Howell testified that he had a lot of relatives in Union County, grew up in New Albany and also graduated from a school in New Albany. Howell testified that besides the nine years that he lived in Starkville he had lived in New Albany until 1998. The trial court denied Howell's motion for a jury consultant.

¶41. This Court has stated:

> [T]he Fifth Circuit has recently held that the right of an **indigent** to a court-appointed psychiatric expert does not extend to a right to a jury-selection expert. ***Moore v. Johnson***, 225 F.3d 495, 503 (5th Cir. 2000). There, the court noted that a "defendant cannot expect the state to provide him a most-sophisticated defense; rather, he is entitled to 'access to the raw materials

integral to the to the building of an effective defense.'" *Moore*, 225 F.3d at 503 (citing *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53(1985)).

*Grayson v. State*, 806 So.2d 241, 255 (Miss. 2001) (emphasis added).

¶42.    This Court has further analyzed an **indigent's** right to defense expenses to hire experts, stating:

> An indigent's right to defense expenses is "conditioned *upon a showing that such expenses are needed to prepare* and present an adequate defense." *Ruffin v. State*, 447 So.2d 113, 18 (Miss. 1984). Concrete reasons for requiring an expert must be provided by the accused. *Hansen v. State*, 592 So.2d 114, 125 (Miss. 1991).
>
> In determining whether a defendant was denied a fair trial because of failure to appoint or allow funds for an expert, some of the factors to consider are whether and to what degree the defendant had access to the State's experts, whether the defendant had the opportunity to cross-examine those experts, and lack of prejudice or incompetence of the State's experts. *Fisher v. City of Eupora*, 587 So.2d 878, 883 (Miss. 1991). We have also considered to what extent the State's case depends upon the State's expert, *Tubbs v. State*, 402 So.2d 830, 836 (Miss. 1981), and the risk of inaccuracy in resolving the issue for which the expert is requested. *Johnson v. State*, 529 So.2d 577, 592 (Miss. 1988).

*Green v. State*, 631 So.2d 167, 171-72 (Miss. 1994).

¶43.    Since Howell did not proceed as an indigent or have the trial court declare him to be an indigent, there is no authority to require the State to fund his request for defense expenses. Furthermore, based on this Court's holdings in *Grayson* and *Green*, Howell's argument that his father's lack of contact with Union County required a jury consultant is unpersuasive. This issue is without merit.

### C.  Limited Daily Transcripts

¶44. Howell requested that the trial court make the county responsible for providing the defense with a copy of daily transcripts of the testimony of co-defendants, Ray and Lipsey, and the testimony of secondary witnesses, Shaw, Powell and Rice. The trial court stated:

> The Court is not going to order that the county pay for it [daily transcripts]. But if you want to make some arrangements with Mrs. Fair [the court reporter] that is between you and your client and Mrs. Fair.

¶45. Howell was not precluded by the trial court from obtaining the daily transcripts nor did Howell demonstrate that he had been denied access to daily transcripts by the court reporter. Furthermore, Howell offers this Court no authority which requires the State to furnish a criminal defendant with daily transcripts. We find no manifest injustice or any abuse of discretion in the trial court's denial of Howell's request for daily transcripts. *See **Ruffin v. State***, 481 So.2d 312, 314-15 (Miss. 1985) (trial court did not abuse its discretion in denying an **indigent** defendant with a transcript of the prior trial which ended in mistrial).

### D. Additional Counsel

¶46. Howell also requested that the State furnish additional counsel to assist Howell's retained counsel in handling his case. Before denying Howell's request for additional counsel, the trial court requested supporting authority. Howell offered no authority to the trial court, nor does Howell offer any authority on appeal. The trial court ruled:

> I think you [defense counsel] are very good but, I don't know of any authority this court would have to appoint somebody. So I'm going to deny your motion.

¶47. Furthermore, the record reflects that a second attorney, Jak Smith, assisted in Howell's case at various stages: voir dire, jury selection, arguments involving evidentiary matters,

questioning of witness, arguments on jury instructions and closing arguments. Jak Smith is also listed in Howell's certificate of interested persons as attorney for the defendant/appellant.

¶48. We find that the trial court did not err by refusing to furnish Howell a court-appointed attorney to assist his retained counsel. The constitution does not require the appointment of two attorneys in a case where the death penalty is involved. In *Bell v. Watkins*, 692 F.2d 999, 1009 (5th Cir. 1982), the court stated that "[a]lthough Mississippi courts may customarily appoint two lawyers in a capital case, the constitution dictates no such requirement." This assignment of error is without merit.

### E. Additional Psychiatric Examination

¶49. Finally, Howell claims that the trial court erred in not allowing funding for additional psychiatric examination. Howell had already received, by agreement between the parties, a psychiatric examination from Dr. Louis Masseur (Dr. Masseur). Howell relies on Dr. Masseur's comment in his notes that Howell suffered slight distortion of reality as to the facts. Howell introduced a copy of Dr. Masseur's handwritten notes indicating what he would charge for an additional hour on the mitigating factors. The trial court ruled that based on what it had seen and heard, further funding for additional psychiatric examination was not warranted.

¶50. Howell cites *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1984), in support of his position. In *Ake* the United States Supreme Court determined that "when a defendant demonstrates to the trial judge that his sanity at the time of the offenses to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation and presentation of the defense." 105 S. Ct. at 1096.

20

¶51. We find that Howell's reliance on *Ake* is misplaced as he did not raise an insanity defense at trial. *See Cole v. State*, 666 So.2d 767, 781 (Miss. 1995). In *Cole*, the defendant's post-conviction relief appeal from the affirmance of his conviction and death sentence relied upon *Ake* contending that he had been deprived due process and equal protection, as well as, his Fifth, Sixth and Eighth Amendment rights. This Court determined that since sanity was not an issue, Cole was not entitled to additional mental examination.

¶52. This Court has considered a similar argument raised by an **indigent** defendant and held:

> A defendant is not entitled to a psychological expert where he has not raised insanity as a defense or where the State does not plan to submit psychological evidence against the defendant. *Ladner v. State*, 584 So.2d 743, 757 (Miss. 1991); *Nixon v. State*, 533 So.2d 1078, 1096 (Miss. 1987). As we have stated, "[w]here a defendant offers no more 'than undeveloped assertions that the requested assistance would be beneficial,' no trial court is under an obligation to provide him with fishing equipment." *Griffin v. State*, 557 So.2d 542, 550 (Miss. 1990) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985)).
>
> Bishop did not raise an insanity defense; he offered no facts which would show that there was a need to develop mitigating evidence based on psychological problems; and he underwent a thorough psychological evaluation performed at the State Hospital which produced not mitigating evidence.
>
> We therefore find, that Bishop was not entitled to a psychological expert for the purpose of developing mitigating evidence.

*Bishop v. State*, 812 So.2d 934, 939-40 (Miss. 2002).

¶53. As Howell did not proceed as an indigent or raise insanity as a defense, we find that the trial court did not err in denying his request for additional psychiatric examinations. This assignment of error is without merit.

### III.    Jury Panel Selection

¶54. Howell raises two arguments on appeal as to the selection process involved in composing the jury wheel used to draw Howell's prospective jurors. The circuit clerk testified

that at the time of Howell's jury draw, the jury wheel consisted of 1,195 prospective jurors. The jury wheel had originally consisted of the names of 3,000 qualified electors selected from the roughly 16,200 qualified electors in Union County. Each time a jury panel was selected, the circuit clerk removed those names from the wheel and they were not available for selection at the next draw. Howell contends that the trial court erred by not quashing the jury panel because he was denied a jury from a "fair cross section of the community." However, Howell admits that the circuit clerk followed the procedure dictated in Miss. Code Ann. §§ 13-5-10 & -12 (Rev. 2002). Therefore, we find that the circuit clerk clearly complied with the dictates of Miss. Code Ann. §§ 13-5-10 and 13-5-12. This issue is without merit.

¶55. Howell next contends that prohibiting the selection of jurors under the age of 21 years old pursuant to Miss. Code Ann. § 13-5-1 (Rev. 2002) constitutes intentional discrimination against persons who are 18 to 20 years old.

¶56. This Court has repeatedly rejected this argument.

> This Court has previously considered the exclusion of persons under age 21 from jury service and has consistently held that the exclusion does not violate the state or federal constitution. *Turner v. State*, 573 So.2d 657, 666 (Miss. 1990), rev'd on other grounds; *Irving v. State*, 498 So.2d 305, 319 (Miss. 1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987); *Fermo v. State*, 370 So.2d 930, 934 (Miss. 1979); *Joyce v. State*, 327 So.2d 255, 261 (Miss. 1976); *Johnson v. State*, 260 So.2d 436, 437 (Miss. 1972).

*Milano v. State*, 790 So.2d 179, 188 (Miss. 2001). *See Jordan v. State*, 786 So.2d 987, 1024 (Miss. 2001). Therefore, we find that this argument is also without merit. The circuit clerk properly followed the statutes of this State in drawing and selecting Howell's jury.

**IV.** *Batson*

¶57. Howell contends that the trial court erred by allowing the State to exercise its peremptory challenges on two black members of the venire, namely Juror 34 (High) and Juror 68 (Wade). The record reflects that the State exercised a total of 12 peremptory challenges, 11 on the jury panel and 1 on the alternates. The jury was selected, and the trial court recessed for lunch.

¶58. Howell did not raise a contemporaneous objection to the State's use of its two peremptory challenges as to Juror 34 and 68. However, the record indicates that, prior to resuming court and empaneling the jury, Howell's counsel requested "that the State provide race neutral reasons for disqualifications of two jurors (Jurors 34 and Juror 68) under *Batson*." The record reflects the following exchange occurred:

> State: Your Honor. I don't know if they made out a prima facia case of racial discrimination. Nevertheless without waiving our argument. I would state as our reason to first of all there are only three African American remaining on the entire panel. I exercised 12 strikes, two of which were of African American. First strike that I exercised was on juror number 34. He was a black male Lavorigia High, [J]unior. Mr. High has had several arrests here actually on his jury questionnaire he has had a recent public drunk and he is the Highs and the Fosters are related. He didn't state anything about being related. That is information that I have gathered from some of the law enforcement. And the main reason is when I left here two weeks ago from the 60 motions that we went through some woman ran into me. It happened in front of Mr. High's house. Mr. High's brother came out and he was first one out there. Mr. High was out there and I believe they saw the wreck but when I sent the officers over there the brother stayed outside and you can see him inside the screen and he wouldn't tell them that he saw it. So that is our reasons for having striken him.
>
> The Court: Let me hear you on your next one. The other one was.
>
> The Court: Number 68.
>
> State: Anthony Wade. Anthony Wade is an African American. Who put down on his jury questionnaire that he had never been arrested for

23

a crime when I have right here warrants that were issued for receiving stolen property out of Lee County where he was arrested. Yes, here is a copy of his arrest record of Anthony Wade in Lee County for receiving stolen property. There were some guns in that case arose out of stolen here in Union County that wound up in the possession of Anthony Wade and he did not state that he had been arrested. And I have the arrest record here available. You can make it a part of this record so therefore we believe that he was not forth coming in his jury questionnaire and that his criminal activity would prevent him from being a fair and impartial juror. And that was our main reason for striking him but also I assume defense counsel would have striken him because he testified that if the county coroner Mark Golden testified he would follow his testimony.

The Court:  All right. The court is satisfied of the race neutral reasons even though I don't think there has been any pattern of racial discrimination. But I think it would be sufficient. Anything else before we go now.

¶59.    A reversal will only occur if the factual findings of the trial judge appear to be "clearly erroneous or against the overwhelming weight of the evidence." *Tanner v. State*, 764 So.2d 385, 393 (Miss. 2000) (citing *Stewart v. State*, 662 So.2d 552, 558 (Miss. 1995)); *Davis v. State*, 551 So.2d 165, 171 (Miss. 1989). "On appellate review, the trial court's determinations under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), are accorded great deference because they are based, in a large part, on credibility." *Coleman v. State*, 697 So.2d 777, 785 (Miss. 1997) (citing *Lockett v. State*, 517 So.2d 1346, 1349 (Miss. 1987)). The term "great deference" has been defined in the *Batson* context as meaning an insulation from appellate reversal any trial findings which are not clearly erroneous. *Lockett v. State*, 517 So.2d at 1349.

¶60.    In *Batson*, the United States Supreme Court held that a peremptory challenge cannot be used to exclude venire-persons from jury service based on their race. *Batson v. Kentucky*,

24

476 U.S. 89, 106 S.Ct.1712, 90 L.Ed.2d 69 (1986). A peremptory challenge based on race constitutes a violation of equal protection. *Id*. at 98.

¶61.   The necessary steps to resolve a peremptory challenge based upon *Batson* are cited in *Stewart v. State*, 662 So.2d 552, 557-58 (Miss. 1995), as follows:

> 1.   The party objecting to the peremptory challenge must first make a prima facie showing that race was the criteria for the exercise of the peremptory challenge.
> 2.   If this initial showing is successful, the party desiring to exercise the challenge has the burden to offer a race-neutral explanation for striking the potential juror.
> 3.   The trial court must then determine whether the objecting party has met their burden to prove there has been purposeful discrimination in the exercise of peremptory challenges.

To establish the first prong, a prima facie case under *Batson*, the objecting party must show (1) that he/she is a member of a "cognizable racial group," (2) the prosecutor has exercised peremptory challenges toward the elimination of prospective jurors of his race, and (3) the facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of striking minorities. *Conerly v. State*, 544 So.2d 1370, 1376-77 (Miss. 1989).

¶62.   In the case sub judice, a review of the record demonstrates that the State provided race neutral reasons for striking juror 34 and 68. Great deference is afforded to a trial court's ruling. Therefore, this issue is without merit.

### V.   Individual Sequestered Voir Dire

¶63.   Howell contends the trial court erred in denying his request to conduct individual sequestered voir dire of prospective jury members who had read articles or seen information about the case on television. Howell wanted to question these prospective jurors as to their

knowledge of any facts concerning the "alleged" robbery and Howell's previous drug conviction that appeared in newspaper articles. The trial court concluded that Howell's counsel had questioned the prospective jurors 13, 85, 88, 106, 126, 127, 146 and 153 at issue, who indicated they had heard about the case.

¶64. Howell's counsel had generally questioned them as to whether they would have to hear strong evidence to contradict what they had seen or heard. The trial court took a recess. In chambers, Howell's counsel requested individual sequestered voir dire. The trial court ruled that Howell's counsel could ask more narrow questions in general voir dire in order to elicit the information.

¶65. Furthermore, each juror had completed juror questionnaires which asked questions to determine if they had ever heard of Marlon Howell or his family; Adam Ray or his family; and Curtis Lipsey or his family. The questionnaires asked the jurors to "[p]lease explain what you know about" each of these individuals. Therefore, each juror had been individually questioned as to any prior knowledge of Howell.

¶66. More importantly, the record further reflects that prospective jurors 13, 85, 88, 106, 126, 127, 146 and 153 in question did not end up serving on the jury. Jurors 13, 88 and 126 were excused for cause at Howell's request. At the time of the request for individual sequestered voir dire, juror 106 had already been excused from the panel. After the request, the parties agreed to strike juror 85. Jury selection did not reach jurors 127, 146 and 153. They did not serve on the jury or as alternates, and they were never tendered for possible service on the jury.

¶67.    This Court has held that voir dire "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Ballenger v. State*, 667 So.2d 1242, 1250 (Miss. 1995) (citing *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 2230, 119 L.Ed.2d 492 (1992), citing *Ristaino v. Ross*, 424 U.S. 589, 594, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976)) (quoting *Connors v. United States*, 158 U.S. 408, 413, 15 S.Ct. 951, 953, 39 L.Ed. 1033 (1895)).  *See also Foster v. State*, 639 So.2d 1263, 1274 (Miss. 1994).  This Court has stated that the trial court should take a substantial role in conducting *Witherspoon* voir dire of the venire panel in capital cases. *Ballenger v. State*, 667 So.2d at 1250; *see Hansen v. State*, 592 So.2d 128-29; *Lockett v. State*, 517 So.2d at 1335.

¶68.    Rule 3.05 of the Uniform Circuit and County Court Rules addresses voir dire examination of jurors:

> In the voir dire examination of jurors, the attorney will question the entire venire only on matters not inquired into by the court.  Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court.  No hypothetical questions requiring any juror to pledge a particular verdict will be asked.  Attorneys will not offer an opinion on the law.  The court may set a reasonable time limit for voir dire.

¶69.    "A jury selection procedure which gives the defendant 'a fair opportunity to ask questions of individual jurors which may enable the defendant to determine his right to challenge that juror' is proper." *McLemore v. State*, 669 So.2d 19, 25 (Miss. 1996) (quoting *Peters v. State*, 314 So.2d 724, 728 (Miss. 1975)).

¶70.    "The trial court has broad discretion in passing upon the extent and propriety of questions addressed to prospective jurors." *Stevens v. State*, 806 So.2d 1031, 1062 (Miss.

27

2001). *See also* ***McGilberry v. State***, 741 So.2d 894, 912 (Miss. 1999); ***Davis v. State***, 684 So.2d 643, 651-52 (Miss. 1996); ***Jones v. State***, 381 So.2d 983, 990 (Miss. 1980).

¶71. We find nothing in the record that supports Howell's contention that the trial court erred by denying his request to conduct individual sequestered voir dire. None of the prospective jurors whom Howell sought to individually voir dire actually served on the jury that was seated. Finally, Howell presents no evidence of any harm or prejudice which resulted because of the denial for individual voir dire. *See Stevens*, 806 So.2d at 1054. This issue is without merit.

### VI. Voir Dire Examination

¶72. During voir dire, Howell sought to question jurors as to whether or not they had ever seen or heard of police officers "puffing up" or giving untrue testimony about the facts of a case. The State objected to this line of questioning which was sustained by the trial court. The "puffed testimony" question was proposed to Juror 153 (Whiteside). The question posed by the defense did not involve the facts of the case sub judice.

¶73. Next, Howell questioned Juror 98 (Nobles) about his feelings against the death penalty and the type of cases in which he might vote for the death penalty. The State objected to the question, and it was sustained by the trial court. Howell finally questioned the jurors concerning whether they believed mercy should be a factor in considering a death penalty sentence. The State objected to this question, and the objection was sustained by the trial court.

¶74. The only authority provided by Howell in support of his argument, that the trial court erred in restricting voir dire of the jury panel, is the general concept that the trial court has the

responsibility to control the voir dire process. Howell cites *Mack v. State*, 650 So.2d 1289, 1304 (Miss. 1995), which states, "[t]rial courts have a responsibility to control voir dire but in doing so they must take care not to hinder a full exploration of a juror's predisposition by hypothetical or otherwise." (citing *Dennis v. United States*, 339 U.S. 162, 171, 172, 70 S.Ct. 519, 523-524, 94 L.Ed. 734 (1950)).

¶75.   Voir dire "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Ballenger v. State*, 667 So.2d at 1250-51 (citing *Morgan v. Illinois*, 504 U.S. at 729). *See also* *Foster v. State*, 639 So.2d at 1274. "The standard of review in examining the conduct of voir dire is abuse of discretion." *Jackson v. State*, 791 So.2d 830, 835 (Miss. 2001). Further, "[a]buse of discretion will only be found where a defendant shows clear prejudice resulting from undue lack of constraint on the prosecution or undue constraint of the defense." *Id*. at 835-36 (citing *Davis v. State*, 684 So.2d at 652). "A jury selection procedure which gives the defendant 'a fair opportunity to ask questions of individual jurors which may enable the defendant to determine his right to challenge that juror' is proper." *Stevens*, 806 So.2d at 1062.

¶76.   It is evident from the record that the trial judge did not abuse his discretion in sustaining the State's objection to Howell's three proposed questions. More importantly, however, is the fact that Howell was not harmed in any way by the trial court's rulings. None of the prospective jurors to whom the first two questions were directed actually served on the jury.[3]

---

[3]   Neither of the jurors whom Howell sought to question actually served on the jury. As stated previously, the jury selection never reached Juror 153 (Whiteside) so he was never tendered to the defense. Additionally, Juror 98 (Nobles) was tendered as an alternate and struck by the defense.

¶77. Lastly, the third question, concerning mercy, was directed to the entire venire panel. "This Court has repeatedly held that 'capital defendants are not entitled to a mercy instruction.'" *Goodin v. State*, 787 So.2d 639, 657 (Miss. 2001) (citing *Jordan v. State*, 728 So.2d at 1099)). "The United States Supreme Court has held that giving a jury instruction allowing consideration of sympathy or mercy could induce a jury to base its sentencing decision upon emotion, whim, and caprice instead of upon the evidence presented at trial." *Goodin*, 787 So.2d at 657. Accordingly, we find that since this Court has held that the jury is not entitled to be instructed to give mercy, then there is no error in the trial court's decision to disallow questioning prospective jurors on voir dire as whether they would provide mercy in sentencing.

¶78. The record does not indicate that the trial court abused its discretion or that Howell was denied a fair opportunity to conduct voir dire on any relevant issue. As such, Howell's arguments on this point are clearly without merit.

## VII. Identification of Howell and Illegal Arrest

¶79. Howell contends that Rice's eyewitness identification should have been suppressed as the lineup was suggestive. The record reflects that a pretrial hearing was conducted on Howell's motion to suppress the identification testimony.

¶80. Rice testified that on the morning in question, he was in his living room watching television while he was getting ready for work. He heard a car horn, went to the window and pulled back the blinds. Rice had described the lighting conditions as "[p]re-dawn." Rice talked to Officer Kent at the scene that morning. He had identified the shooter as wearing a plaid flannel jacket that was open with a light colored t-shirt underneath and a pair of blue jeans. He did not notice the shooter's shoes.

¶81. Later that morning, at the police station, Rice gave a statement to Officer Kent and Chief Grisham. Rice stated that the shooter was wearing a red and black plaid flannel shirt. Howell contends that Rice misidentified him as wearing a long sleeve plaid red and black shirt as opposed to the green short sleeve shirt described by other witnesses. Rice told the police that the shooter was a black male. Rice left the police station and returned later that day to participate in a lineup upon being informed that three people had been arrested.

¶82. According to Rice, none of the officers gave a description of the defendant or made any suggestions as to his identity. Rice testified that there was nothing about the lineup that was suggestive. Rice described the lineup as follows:

> I was in the small office with a desk and couple of chairs and I was kind of sitting on the edge of the desk squatting against it. There was a small window, yay high, yay wide and they told me that the men would be brought out one at a time. Take my time and if I can identify the gentleman that I saw the morning prior to let them know. When they came out they came out, said they would phase (face) me. Turn sideways and leave and then they would bring the next one out. They brought a total of six. But I didn't need to see all six them. When I saw the third person of the line up which was Mr. Howell, I identified him at that time.

When Rice proceeded to view the six people in the lineup, he identified Howell as the shooter.

¶83. Chief Grisham testified that the lineup was composed of six, young, black males, who were inmates. They were selected by a computer program to help choose similar size, race, age, and things of that nature. No one pressured Rice to identify Howell. Rice was not shown any photographs prior to the lineup.

¶84. Chief Grisham's testimony at trial reflected that the other five subjects in the lineup were Dominique Cannon, 6', 130 pounds; Robert Antron Carr, 5'10", 135 pounds; Romaro Dixon, 6', 145 pounds; Brad Marion, 6', 160 pounds; Robert Harris, 6'2", 185 pounds. Howell's

31

arrest sheet reflects him to be 6'2", 175 pounds. However, Chief Grisham did place in the case file a photographic display of the people in the lineup. The picture was taken in an adjacent room, prior to the time the participants went into the lineup room. Two or three of the individuals in the lineup were as tall as Howell. Chief Grisham did not observe that Howell was the only one wearing tennis shoes.

¶85. The picture showed six young, black men, all of whom are wearing street clothes. The feet of four of the six people in the lineup appear in the photograph. Of those four, Howell was the only one wearing sneakers. The other three men in the picture wore socks and sandals. Howell claims that the height, weight, skin tone and hair of the other people in the lineup were different than his appearance.

¶86. Rice specifically testified that he was not able to see the feet of the people in the lineup. The window that he was looking through "was up off the floor" and he was looking at people's faces. Rice testified that he did not pay attention to what they were wearing.

¶87. Howell was represented by a local attorney, Regan Russell (Russell), who was present at the lineup. Officer Kent was also present in the viewing room with Rice and Russell. Chief Grisham was not in the viewing room at the time the lineup was conducted.

¶88. After hearing this evidence and related argument, the trial court denied the motion to suppress, concluding that the lineup was proper and not tainted or suggestive.

¶89. In *White v. State*, 507 So.2d 98, 99-100 (Miss. 1987), this Court in upholding a lineup where the defendant was the only person with plaited hair, stated that:

> In *York v. State*, 413 So.2d 1372 (Miss. 1982), this Court reviewed United States Supreme Court decisions addressing due process violations predicated on impermissibly suggestive lineups. The Court said:

32

An impermissibly suggestive pretrial identification does not preclude in-court identification by an eyewitness who viewed the suspect at the procedure, unless: (1) from the totality of the circumstances surrounding it (2) the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

Even if testimony is proffered of the out-of-court identification itself, the same standard exists as to the above, with the omission of the word "irreparable."

In determining whether these standards are fulfilled, *Neil v. Biggers* states the following may be considered:

> ... the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
> 409 U.S. at 199, 93 S.Ct. at 382.

In the final analysis, under *Manson v. Brathwaite*, "reliability is the linchpin in determining the admissibility..."

*York*, 413 So.2d at 1383. *See Foster v. State*, 493 So.2d 1304 (Miss. 1986) (Foster was the only member of the lineup wearing a distinctive fishing hat, and the Court rejected Foster's contention that the lineup was impermissibly suggestive); *Jones v. State*, 504 So.2d 1196 (Miss. 1987), (Jones was the only person in a photograph display wearing a cap similar to the one worn by the rapist, and the display was not so suggestive as to be impermissible).

¶90.　In *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), the U.S. Supreme Court set out five factors to be considered in determining whether a lineup is impermissibly suggestive:

1.　The opportunity of the witness to view the criminal at the time of the crime.
2.　The witness's degree of attention.
3.　The accuracy of the witness's prior description of the criminal.
4.　The level of certainty demonstrated by the witness at the confrontation.
5.　Length of time between the crime and the confrontation.

*See White*, 507 So.2d at 100.

¶91. When the lineup is considered in light of the ***Biggers*** factors, it is evident that: (1) Rice's view of the shooter was brief[4]; but, (2) he was paying very close attention, once he realized that a shooting had taken place; (3) he accurately described Howell as a young, clean cut, black male; (4) he was absolutely certain of Howell's identity when he saw him in the lineup; and (5) the lineup took place a little over 24 hours after the shooting. *See **Biggers***, 409 U.S. at 199.

¶92. Howell was represented by counsel throughout the lineup procedure. Furthermore, the jury was instructed on how to consider eyewitness identification.[5] Under the totality of the circumstances, there is no likelihood whatsoever, that Rice's identification was not reliable.

---

[4] Rice testified that it was "pre dawn," but he could see. Both vehicles had their lights on. The lights of the rear vehicle were shining on the shooter. The neighborhood was "well lit." There was a streetlamp right across the street from Rice's house and one at the end of the block. Rice's neighbor had a porch light on. Rice's view was unobstructed.

[5] Instruction S-8 provided, in pertinent part:

Identification testimony is an expression of the belief or impression by the witness. You must judge its value and reliability from the totality of the circumstances surrounding the crime and the subsequent identification. In appraising identification testimony of a witness, you should consider the following:

1. Did the witness have an adequate opportunity to observe the offender?
2. Did the witness observe the offender with an adequate degree of attention?
3. Did the witness provide an accurate description of the offender after the crime?
4. How certain is the witness of the identification?
5. How much time passed between the crime and the identification?

If, after examining all of the testimony and the evidence, you have a reasonable doubt that Marlon Latodd Howell was the person who committed the crime, then you must find Marlon Latodd Howell is not guilty.

The defense indicated that this was a "good" instruction. The jury's verdict demonstrates how it resolved any issues about the identification.

*See Biggers*, 409 U.S. at 199, 93 S.Ct. at 382; *York*, 413 So.2d at 1383.  Furthermore, this Court has repeatedly held that "the jury is the final arbiter of a witness's credibility." *See Williams v. State*, 794 So.2d 1019, 1028 (Miss. 2001); *Morgan v. State*, 681 So.2d 82, 93 (Miss. 1996).  The jury alone determines the weight and worth of any conflicting testimony. *Hicks v. State*, 812 So.2d 179, 194 (Miss. 2002).  Rice's credibility as a witness at trial rests with the jury.  Therefore, we find that this issue is without merit.

¶93.   Additionally, Howell contends that the identification was the result of an alleged illegal arrest.  Howell alleges that the Field Officer's Warrant or "blue warrant" under which he was arrested was invalid.

¶94.   Probation and Parole Officer Nance testified that the New Albany Police Department called him on the evening of May 15, 2000, to inquire whether the Mississippi Department of Corrections (MDOC) had a picture of Howell.  Nance checked Howell's file and discovered that Probation and Parole Officer Mullins had entered a warrant for Howell's arrest into the computer, but Officer Mullins had not signed the warrant.  Officer Nance telephoned Officer Mullins, and the record reflects that the following transpired:

> I asked [Mullins] if we could go get the warrant, asked him if he had sent a copy of it to the Sheriff's department which he had not at that time to the best of my knowledge and asked if we could go ahead and get the warrant and serve it on him and go ahead and place him under arrest of the D O C for the violation that he had listed on his warrant.  He said that will be fine, go ahead and get it.  Chad Glasson, New Albany police officer and I went to the Tippah County Officer, looked in the file, found the warrant that Mr. Mullins had typed up.  He had not signed the warrant but he had issued the warrant.  I turned around and copied the warrant exactly as he had it.  Put my name down there as the field officer and signed it.  That way we would have truly valid warrant.  That is the only reason that I issued the warrant instead of Chuck Mullins because he had not signed the warrant.

¶95. Officer Nance further explained that:

The administrative authority we have as field officers have the right to issue a field officer[']s warrant for a violation of probation, terms and conditions. We are to get a judge[']s warrant as soon as possible after the field officers warrant is issued. The reason that I signed it instead of Chuck [Mullins] is because he had not signed the field officer[']s warrant hisself. He had issued it, typed in his name but just had not signed it.

¶96. The warrant charged that Howell had violated his probation by "failure to avoid injurious or vicious habits, fail[ure] to pay supervision fees, fail[ure] to pay for positive urine screen fail[ure] to pay court ordered monies." Shortly after the warrant was issued, Howell was arrested and transported to the New Albany Police Department. The arrest warrant from Justice Court Judge Ronnie Rakestraw was obtained around noon on May 16, 2000.

¶97. The trial court ruled "that the arrest was in fact proper and that there wasn't anything illegal about it." Howell contends that Officer Nance did not have authority to sign the warrant which rendered an illegal arrest. Howell alleges that Officer Nance had no personal knowledge of the circumstances in the warrant.

¶98. Officer Nance clearly had the legal authority to issue the warrant. The applicable statute provides in pertinent part as follows:

Any probation and parole officer may arrest a probationer without a warrant, or may deputize any other officer with power of arrest to do so by giving him a written statement setting forth that the probationer has, in the judgment of the probation and parole officer, violated the conditions of probation. Such written statement delivered with the probationer by the arresting officer to the official in charge of a county jail or other place of detention shall be sufficient warrant for the detention of the probationer.

Miss. Code Ann. § 47-7-37 (Rev. 2000). Accordingly, we find that this issue is wholly without merit.

## VIII.    Howell's Statement

¶99.    As a continuation of issue VII, Howell contends that the statement he gave to the police on May 15, 2000, at approximately 9:30 p.m. should have been suppressed.  The record reflects that Howell was read a waiver-of-rights form at 9:29 p.m., and he signed the waiver at 9:31 p.m.  Howell argues that since his arrest was illegal, because Officer Nance signed the "blue warrant,"  the statement should have been suppressed.  Finding that the arrest was proper, the trial court denied Howell's motion to suppress.

¶100.    As issue VII concluded that Howell's arrest was in fact valid, this issue is without merit. Therefore, we find that the trial court did not err in denying Howell's motion to suppress his statement given to the police.

## IX.    Howell's Statements Made to Other Witnesses

¶101.    Howell alleges that the trial court erred by allowing co-defendant, Lipsey, and witnesses, Shaw and Powell, to testify that he stated that he needed money to pay his probation officer.  Howell contends that the statements attributed to Howell constituted hearsay and that the probative value of admitting the statement does not outweigh the prejudicial effect to his case.  Howell claims that the State was allowed to bring his prior convictions in through the backdoor through the testimony of Lipsey, Shaw and Powell since Howell did not testify.

¶102.    The State offered witness testimony regarding statements attributed to Howell in order to demonstrate a possible motive for Pernell's murder.  M.R.E. 404(b) provides in part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.  It may, however, be admissible for other purposes such as proof of motive...

37

The State contends that Howell's motive for killing Pernell was to obtain money to pay his probation officer in order to remain out of jail.

¶103. This Court has consistently allowed the admission of other crimes to prove intent. *See Hill v. State*, 797 So.2d 914, 917 (Miss. 2001) (where this Court found that evidence of defendant's arrest was properly introduced to establish a possible motive for murder); *Sumrall v. State*, 758 So.2d 1091, 1095 (Miss. 2000); *Burns v. State*, 729 So.2d 203, 222 (Miss. 1998); *Warren v. State*, 709 So.2d 415 (Miss. 1998); *Hunt v. State*, 538 So.2d 422 (Miss. 1989); *Jenkins v. State*, 507 So.2d 89 (Miss. 1987); *Duplantis v. State*, 644 So.2d 1235 (Miss. 1994); *Smith v. State*, 499 So.2d 750 (Miss. 1986); *Ballenger v. State*, 667 So.2d at 1242; *Conner v. State*, 632 So.2d 1239, 1273-74 (Miss. 1993) (where this Court found that evidence relating to cocaine use was used to establish motive for crime rather than to show bad character).

¶104. The State further cites *Burns v. State*, 729 So.2d 203, 220-22 (Miss. 1998), in support of its position. In *Burns*, the defendant argued that the trial court erred by allowing a witness to refer to the defendant's own statements about a prior crime. The witness testified that Burns had committed the murder because he "did not want to go back to the pen." *Id*. at 220. Pursuant to M.R.E. 404 (b), this Court concluded that the testimony was "admissible to show motive - that Burns killed [the victim] so that he could not be identified and be sent back to the penitentiary...." *Id*. at 221-22.

¶105. However, relevant evidence may still be excluded. In *Foster v. State*, 508 So.2d 1111, 1117 (Miss. 1987), this Court held:

Relevant evidence may still be excluded if its probative value is substantially outweighed by danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Miss.R.Evid. 403. Thus, a trial court presented with Rule 403 objection to relevant evidence must engage in a balancing process. The more probative the evidence is, the less likely it is that a 403 factor will be of sufficient consequence to substantially outweigh the probative value...

To tip the scale is not enough. The 403 factors must, in the language of the rule, "substantially outweigh" probative value before the evidence may be excluded. The trial court is afforded broad discretion in weighing these interests. *United States v. Chalan*, 812 F.2d 1302 (10th Cir. 1987); *Brumley Estate v. Iowa Beef Processors, Inc.*, 704 F.2d 1351 (5th Cir. 1983), cert. denied, 465 U.S. 1028, 104 S.Ct. 1288, 79 L.Ed.2d 690 (1984).

¶106. We find that the trial court did not abuse its discretion in allowing the testimony. The record clearly reflects that any prejudice from admitting the testimony does not substantially outweigh the probative value of allowing the testimony to establish Howell's motive and intent.

¶107. Finally, Howell argues that the trial court should have provided a limiting instruction informing the jury as to witness credibility. The record reflects that the State offered a limiting instruction, jury instruction S-9, which was given by the trial court. Jury instruction S-9 provided:

The Court instructs you that any evidence you may have heard regarding a witnesses' or the defendant's character or bad acts may not be considered by you to prove the character of the defendant in order to show that he acted in conformity therewith on the occasion alleged in the indictment. You may consider this evidence only for the purpose of proof of motive, intent, knowledge, absence or mistake or accident.

*See* *McGilberry v. State*, 741 So.2d at 913 ("juries are presumed to follow the instructions given to them by the court"). *See also* *Johnson v. State*, 475 So.2d 1136, 1142 (Miss. 1985) (juries are to follow instructions "To presume otherwise would render the jury system

inoperable."). For all the foregoing reasons, we find that this assignment of error is without merit.

## X. Testimony by Shaw Regarding Statement made by Ray

¶108. Howell contends that the trial court erred in allowing Shaw to testify that Ray told him, "Marlon [Howell] had shot somebody." The record reflects that Ray, Howell, and Lipsey fled to Shaw's house, immediately following the shooting. Shaw's testimony on the State's direct examination was as follows:

> State: When did you know -- what made you know that Adam [Ray], Curtis [Lipsey] and Marlon Howell had returned to your house?
> Shaw: Because I heard a loud noise. Somebody bumping like somebody was running through the house or whatever.
> State: They were running through the house?
> Shaw: Um-huh.
> State: What did you do then?
> Shaw: My girlfriend got up she was fussing. She asked me what was going on and that is when Adam [Ray] came knocking on the door and I got up and went to the door.
> State: Did you get out of the bed and go when you say to the door or your bed room [sic] door?
> Shaw: My bed room [sic] door.
> State: What happened when you went to the bed room [sic] door?
> Shaw: Adam [Ray], he was all hysterical and everything. He said that Marlon [Howell] had shot somebody.
> Defense: Your Honor, we object to the statement.
> The Court: Sustained.
> State: Where was Marlon Howell at when Adam Ray came to your door?
> Shaw: Standing in the front living room.
> State: In the front room?
> Shaw: Yes, sir.
> State: In what tone of voice was Adam Ray talking?
> Shaw: Like he was scared.
> State: Was Marlon Howell positioned so that he could hear what Adam was saying?
> Shaw: Yes, yes, sir.
> State: Did Adam [Ray], did Marlon Howell hear what Adam Ray had to say?
> Shaw: Yes, sir.

40

Defense:       Your Honor, we again object to that.

The Court:     It's overruled.  He can answer go ahead.

State:  When Adam Ray came to your door what did Adam Ray say?

Defense:       Your Honor, we again object to that.

The Court:     It's overruled.  He can answer go ahead.

State:  When Adam Ray came to your door what did Adam Ray say?

Shaw:          He said Marlon had shot somebody.

State:  What did you do at that time?

Shaw:          I ran out of the room and I asked I thought they were playing.  I said no he didn't.  I said are y'all for real.  He said yes, he is for real?

State:  Who said yes he is for real?

Shaw:          Curt [Lipsey].

State:  Was Marlon Howell present when Curt [Lipsey] said that?

Shaw:          Yes, sir.

State:  What else if anything did Curt [Lipsey] say about the situation?

Shaw:          He didn't really say too much of nothing.  They all look like he this real scared and Marlon [Howell] he was standing right there in the front room with us too.

State:  What else did Adam [Ray] have to say?

Shaw:          He didn't really say nothing just looking scared.

State:  Did Marlon Howell say anything?

Shaw:          He told me he said I need to get to Blue Mountain.  He said I need you to take me to Blue Mountain right now.

State:  Wanted you to carry him to Blue Mountain right now.  Where was Marlon standing at when he was saying that?

Shaw:          In the front room with all of us.

State:  Was he doing anything at the time?

Shaw:          He had a green shirt wrapped like around his hand pulled up under his arm like this right here.

State:  So he was standing in your living room with the shirt wrapped around his hand under his arm like this?

Shaw:          Yes, sir.

State:  What did you do?

Shaw:          I was trying to figure how I was going to get him to Blue Mountain.  I really didn't want to take him.  I didn't want him to endanger me or my family or anyone that was in the house.

State:  Were you scared at that time?

Shaw:          Yes, sir....

State:  What did you do then?

Shaw:          He then jumped in the car with his and we headed off and rushed to Blue Mountain.

State:  What now?

Shaw:       He then jumped in the car with us and we rushed off to Blue Mountain.

State:   Where did you go in Blue Mountain first?

Shaw:       We took Marlon [Howell] home.

State:   Marlon [Howell] say anything on the way to Blue Mountain or when he got there?

Shaw:       Nobody was saying anything. I was just trying to hurry up and get him down there.

State:   Once you got to Blue Mountain did anybody say anything then?

Shaw:       He said don't tell nobody. Y'all don't need to tell nobody.

State:   When you say he said don't tell nobody. You don't need to tell anybody, who said that?

Shaw:       Marlon [Howell].

¶109. We find that Shaw's testimony did not constitute hearsay pursuant to M.R.E. 801(d)(2)(B) which provides:

> (d)     Statements Which Are Not Hearsay. A statement is not hearsay if:
> (2)     Admission by Party-Opponent. The statement is offered against a party and is ... (B) a statement of which he has manifested his adoption or belief in its truth...

In *Manning v. State*, 726 So.2d 1152, 1180 (Miss. 1998), this Court basically defined "the common law version" of M.R.E. 801(d)(2)(B) finding that:

> [S]tatements made by a third person, which tend to incriminate an accused, are admissible so long as they are made in the presence of the accused and are not contradicted, denied, nor objected to by the accused.

*Manning*, 726 So.2d at 1180 (quoting *Jolly v. State*, 269 So.2d 650, 656 (Miss. 1972)). *See also Jones v. State*, 367 So.2d 458 (Miss. 1979) (affirming "adoptive admission" where bystander said, "he's the one that done the shooting" and the accused replied, "Yeah, and I'll get you as soon as I get out of this mess").

¶110. In the case sub judice, Ray's statement was made in Howell's presence. Howell did not contradict, deny or object to the statement Ray made to Shaw. Shaw's testimony provided that

Howell was present when the statement was made and did not dispute the statement. In fact, Howell then requested that Shaw drive him home "right now" and told Shaw that "y'all don't need to tell nobody [sic]." Shaw testified that he was afraid of Howell. Shaw testified that he feared for his safety and the safety of his family if he did not comply with Howell's request.

¶111. We find that the record reflects that the trial court did not err in allowing Shaw to testify about Ray's statement. The statement clearly amounts to an "adoptive admission" pursuant to M.R.E. 801(d)(2)(B). *See **Manning***, 726 So.2d at 1180.

¶112. In the case sub judice, the State presented testimony from Rice, who positively identified Howell as the shooter and the testimony of Lipsey, co-defendant, who identified Howell as the person who shot Pernell. We find that this assignment of error is meritless.

## XI. Re-Cross Examination

¶113. Howell contends that the trial court erred by refusing to allow re-cross examination to be conducted by the defense. Howell argues that the trial court's ruling "left the jury with the impression Shaw had no pending criminal charges when he gave his statement to the District Attorney's office." We find that the record reflects that Howell's assertion is meritless. The following exchange occurred on the record:

Cross Examination by the Defense:

| | |
|---|---|
| Defense: | Mr. Shaw, have you been promised anything to testify? |
| Shaw: | No, sir. |
| Defense: | Have you been given any leniency on any criminal matters? |
| Shaw: | No, sir. |
| Defense: | You have not? |
| Shaw: | No, sir. |
| Defense: | Do you have pending criminal matters before the district attorney's office? |
| Shaw: | I have some charges, against me. |

43

Defense:      Those are charges that existed on the day you went down there and gave this statement to the police, isn't it?

Shaw:         Yes, sir.

Defense:      And you have not been prosecuted or brought to trial since have you?

Shaw:         No, sir.

Defense:      Court indulge me one second.

The Court:    All right, sir.

Defense:      We tender the witness.

The Court:    Any redirect, Mr. Luther.


Re-Direct Examination by the State:

State:  I will try to cover this as it came along probably working backwards. You were asked about criminal charges pending against you. What were you charged with doing?

Shaw:         Grand larceny.

State:  What was that of?

Shaw:         That was some stuff consisted on the rail road.

State:  Steel on the rail road?

Shaw:         Yes, sir.

State:  So you are charged with taking some steel off the rail road tracks?

Shaw:         Yes, sir.

State:  When was that charge brought?

Shaw:         About I was about 15 or 16 then.

State:  You were 15 or 16?

Shaw:         Yes, sir.

State:  I believe that was a '98 charge isn't it?

Shaw:         Yes, sir.

State:  '98. I believe you entered the pretrial diversion program; didn't you?

Shaw:         Yes, sir.

State:  Where and when did you enter the program?

Shaw:         I think I was about 18 then.

State:  So I believe that program consisted of if you did not get in any more trouble you wouldn't have a felony record; is that right?

Shaw:         Yes, sir....

State:  Have you been promised anything for your testimony today?

Shaw:         No, sir.

State:  Has the police or district attorneys or anything else even discussed your prior charges with you?

Shaw:         Prior charges towards what.

State:  The incident about taking the steel off the rail road track?

Shaw:         No, sir.

State:  Is that any consideration of your testimony here today?

Shaw:       No, sir.
Defense:    Please the court, I need to ask him one question about the issue
            he brought up about why he is not being prosecuted.
The Court:  You did not object to it as being improper.
Defense:    I don't think it was improper, Your Honor, but he has left the
            impression that I think it needs to be cleared up.
The Court:  I don't.  It's overruled....

¶114.  The trial court stated that for the record that Howell never objected to the State's line

of re-direct questioning concerning Shaw's pending criminal charges as being improper.  The

trial court did not conclude that the jury was left with a false impression of Shaw's criminal

charges.  Shaw testified that he had charges pending when he talked to the District Attorney's

office.  Shaw further testified that his criminal charges were not discussed and he received no

promises or any leniency in exchange for his testimony.

¶115.  In *Whitehurst v. State*, 540 So.2d 1319, 1325-26 (Miss. 1989), this Court stated:

> *Hubbard v. State*, 437 So.2d 430, 434 (Miss. 1983), sets out rather clearly that
> "re-cross examination is not allowable as a matter of right, but a matter of trial
> court discretion."  The defendant's argument that his valuable right of cross-
> examination was bridled, based on *Edge v. State*, 393 So.2d 1337 (Miss. 1981),
> and *Miskelley v. State*, 480 So.2d 1104 (Miss. 1985), avails him none.  *Edge*
> dealt with surrebuttal testimony, and *Miskelley* dealt with cross examination.
> Thus, these cases are factually distinguishable.
>
> *Hubbard* is authority for the proposition that it is proper to deny re-cross
> examination "where there is no claim of oversight and no reason stated why the
> matter was not inquired into on" cross examination.  437 So.2d at 434.

¶116.  Furthermore, this Court held in *Sullivan v. State*, 749 So.2d 983, 991 (Miss. 1999):

> Mississippi has adopted the Corpus Juris Secundum standard for re-cross
> examination of witnesses: "It is proper to exclude questions as to matters which
> were not opened up or brought out on redirect examination, or as to matters
> already fully covered or discussed at length on cross-examination, where there
> is not claim of oversight and no reason stated why the matter was not inquired
> into on the cross-examination proper."  *Hubbard v. State*, 437 So.2d 430, 434
> (Miss. 1983) (quoting 98 C.J.S. Witnesses § 429).  In this case, Sullivan does

45

not allege that he was deprived of his constitutional right to confront witnesses testifying against him. That right is protected by both constitutional and case law. *See* ***Shaffer v. State***, 740 So.2d 273 (Miss. 1998) (citing ***Hamburg v. State***, 248 So.2d 430, 434 (Miss. 1971)).

¶117. From a review of the record and this Court's precedent related to re-cross examination, we find that Howell's allegation that the trial court erred in declining to reopen cross-examination is without merit.

## XII.   Directed Verdict

¶118. Howell contends that the State presented insufficient evidence to prove the underlying felony of robbery and, therefore, the charge of capital murder. In ***Knox v. State***, 805 So.2d 527, 530 (Miss. 2002), this Court stated:

> When reviewing the sufficiency of the evidence, this Court looks to all of the evidence before the jurors to determine whether a reasonable, hypothetical juror could find, beyond a reasonable doubt, that the defendant is guilty. ***Jackson v. State***, 614 So.2d 956, 972 (Miss. 1993). All of the evidence must be considered in the light most favorable to the verdict, and the credible evidence consistent with guilt must be accepted as true. ***Gleeton v. State***, 716 So.2d 1083, 1087 (Miss. 1998) (citing ***Franklin v. State***, 676 So.2d 287, 288 (Miss. 1996); ***Wetz v. State***, 503 So.2d 803, 808 (Miss. 1987)). "The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence." ***Id***.

¶119. Miss. Code Ann. § 97-3-19(2)(e) defines capital murder as:

> (2)   The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
>
> (e)   When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or in any attempt to commit such felonies.

Furthermore, Miss. Code Ann. § 97-3-73 (Rev. 2000) defines robbery as:

46

Every person who shall feloniously take the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person, shall be guilty of robbery.

¶120. The evidence in the record indicates that when Howell got in the car with Shaw, Lipsey and Ray that night, Howell "explained to [them] that he needed some money to pay his probation officer." According to Lipsey, Howell "just got in the car and it was like he needed some money or else [they] weren't going to see him any more after that night, to pay his probation officer."

¶121. In addition, Powell testified that on that night Howell stated that he "needed to pay the probation officer." Howell told Powell "that he was going to have to pay his probation officer. They were going to lock him up." Howell said that "he needed to make a sting for some money ...." That night while driving around Tupelo, Howell observed a man standing outside a closed service station and stated that "there go [sic] an easy lick right there."

¶122. Howell was identified as the shooter by both an independent witness, Rice, and by co-defendant, Lipsey. According to Lipsey, Howell reached inside Pernell's car, and there was some "scuffling or fighting." Howell "had his arm in the man[']s window doing something with him." This lasted about a half a minute. Then, Howell pulled away from the car and raised his hands in the air, jumped back and fired the gun shooting Pernell.

¶123. Lipsey stated that when Howell returned to the car, Howell stated that "the man sprayed him in the face with some mace so he shot him." Lipsey did not smell mace or see tears in Howell's eyes. The police found a large amount of change on the floorboard of the driver's side of the victim's car.

47

¶124. A jury's finding of fact is not to be overturned when there is credible evidence in the record for which the jury could have reasonably inferred the offense or unless the verdict was clearly against the overwhelming weight of the evidence. *Bailey v. State*, 785 So.2d 1071, 1075 (Miss. 2001); *Groseclose v. State*, 440 So.2d 297, 300 (Miss. 1983). There is no doubt that there is ample evidence in the record that a reasonable person could infer Howell's intent to rob Pernell.

¶125. It was within the jury's province to draw reasonable inferences from facts based on experience and common sense. *Lewis v. State*, 573 So.2d 719, 723 (Miss. 1990). Inferences for the motive of robbery have been accepted by this Court when they are reasonable. *See Swinney v. State*, 829 So.2d 1225, 1236 (Miss. 2002) (it may be reasonably inferred that the robbery was interrupted, and the motive was robbery); *Duplantis v. State*, 708 So.2d 1327, 1342 (Miss. 1998) (the jury apparently drew this inference from the facts, and we accept the jury's finding). The jury considered the facts and circumstances after listening to the witnesses then rendered its verdict. The verdict should not be disturbed. The evidence was sufficient to support the verdict. We find this assignment of error to be without merit.

## XIII.   Jury Instruction S-2

¶126. Continuing from issue XII, Howell next contends Miss. Code Ann. § 97-3-19 does not specifically enumerate attempted robbery as an underlying offense for the conviction of capital murder. As such Howell argues that the underlying offense of attempted robbery violates his Eighth and Fourteenth Amendment rights. Specifically, Howell asserts that:

> To allow the trial court to insert attempted robbery as an aggravating factor when it is not specifically set out by statute allows the Court to expand the aggravating circumstances enumerated by MCA § 97-3-19. The aggravating circumstances

48

perform the constitutional necessary function of providing a meaningful basis for distinguishing the few cases in which the death penalty is imposed from many cases in which it is not. *See Godfrey v. Georgia*, 446 U.S. 420, 427, 428 (1980).

¶127. Howell further states that "by allowing the use of attempted robbery, the trial court has extended the narrow parameters of the Mississippi capital murder statute Miss. Code Ann. § 97-3-19." Miss. Code Ann. § 97-3-19(2)(e) provides the list of underlying crimes that can elevate murder to a capital offense. Miss. Code Ann. § 97-3-19(2)(e) further includes "any attempt to commit such felonies" within the statutory provision. Miss. Code Ann. § 97-3-19 (2)(e) defines capital murder as follows:

> The killing of a human being without the authority of law by any means or in any manner.... When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, **robbery**, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, **or in any attempt to commit such felonies**.

Miss. Code Ann. § 97-3-19 (2)(e) (emphasis added).

¶128. We find that Howell's argument is clearly not supported by the language of Miss. Code Ann. § 97-3-19(2)(e). Furthermore, in *Willie v. State*, 585 So.2d 660, 674 (Miss. 1991), the defendant raised similar arguments as the case at hand:

> Willie argues that his conviction must be reversed because (1) the jury returned a general verdict of guilty without specifying whether it found that Willie killed Joe Clardy while Willie robbed or attempted to rob Joe Clardy, and (2) the jury was instructed over Willie's objection that it could find Willie's objection that it could find Willie guilty of capital murder if it found that Willie killed Joe Clardy while engaged in the commission of attempted robbery.
>
> We previously considered Willie's argument in *Culberson v. State*, 379 So.2d 499 (Miss. 1979), cert. denied, 449 U.S. 986, 101 S.Ct. 406, 66 L.Ed.2d 250 (1980). In *Culberson*, we found that reference to subsection 2(e) of Miss. Code Ann. § 97-3-19 and the statutory language, "engaged in the commission

49

of," was sufficient to put a defendant on notice that he could be charged with the commission or the attempt to commit the constituent felony of robbery. ***Culberson***, 379 So.2d at 503-04. Finding nothing new in Willie's argument, we affirm our decision in ***Culberson***.

*Id*. *See also* **Harris v. State**, 445 So.2d 1369, 1370-71 (Miss. 1984). In **Harris**, this Court

held:

In Mississippi *both an attempt to take and an actual taking* of another's personal property against his will by violence to his person or by putting such person in fear of immediate injury to his person by exhibition of a deadly weapon constitutes robbery.

*Id*.

¶129.  Howell contends the trial court erred in granting jury instruction S-2 which contained

the language "attempt to take."  Jury instruction S-2 provided:

THE COURT instructs the jury that if you find from the evidence in this case beyond a reasonable doubt that:

(1)    The defendant, Marlon Latodd Howell, did, on or about the 15th day of May, 2000, unlawfully, willfully and feloniously, attempt to take the personal property of Hugh David Pernell; and,
(2)    The defendant, Marlon Latodd Howell, attempted to take the personal property from the person of Hugh David Pernell and against the will of the said Hugh David Pernell; and,
(3)    The defendant, Marlin [sic] Latodd Howell, attempted to take the property by violence toward Hugh David Pernell by shooting the said Hugh David Pernell with a pistol; and,
(4)    At the time, Marlon Latodd Howell had the intent to permanently deprive Hugh David Pernell of the property,

then you shall find that the defendant Marlon Latodd Howell, was engaged in the commission of the crime of robbery as contemplated by Jury Instruction Number S-1.

If the State of Mississippi has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find that the defendant, Marlon Latodd Howell, was not engaged in the commission of the crime of robbery as contemplated by Jury Instruction Number S-1.

¶130. As discussed, we find that Howell's assignment of error is without merit. Based on the language of Miss. Code Ann. § 97-3-19 (2)(e), we also find that the trial court did not err in granting jury instruction S-2.

### XIV. Instructions D-13, D-18, S-3

¶131. Howell argues that the trial court erred by failing to grant jury instructions for simple murder and manslaughter. The trial court gave jury instruction S-6 as a form of the verdict jury instruction. Instruction S-6 provided:

> The Court instructs the jury that all twelve (12) of you must agree on any verdict that is returned in this case.
>
> The verdict of the jury should be written upon a separate sheet of clean paper, need not to be signed by you, and should be in one of the following forms, to-wit:
>
> 1)    If you find from the evidence in this case, beyond a reasonable doubt, that the defendant, Marlon Latodd Howell, is guilty of capital murder upon Hugh David Pernell as charged under the indictment, then the form or your verdict should be:
>
> "We, the jury, find the defendant, Marlon Latodd Howell, guilty of capital murder as charged under the indictment."
>
> 2)    If you find the defendant, Marlon Latodd Howell, not guilty of capital murder, then the form of your verdict should be:
>
> "We, the jury, find the defendant, Marlon Latodd Howell, not guilty of capital murder under the indictment."

¶132. The State withdrew its jury instruction S-3 on simple murder, citing a lack of evidence presented to support such an instruction. Instruction S-3 provided:

> The Court instructs the jury that if the evidence warrants it, you may find the defendant, Marlon Latodd Howell, guilty of the lesser crime of "simple murder."

However, notwithstanding this right, it is your duty to accept the law as given to you by this Court, and, if the facts and the law warrant a conviction of the crime of "capital murder" as charged in the indictment, then it is your duty to make such finding uninfluenced by your power to find the defendant guilty of a lesser offense.

This provision is not designed to relieve you from the performance of an unpleasant duty. It is included to prevent a failure of justice if the evidence fails to prove the original charge but does justify a verdict for the lesser offense.

¶133. Howell's proposed instruction D-13 submitted both a simple murder and a manslaughter instruction. However, Howell requested to submit S-3 on simple murder, combined with his own instruction on manslaughter.

¶134. The State argued that the evidence did not support an instruction on either simple murder or manslaughter. Specifically, the State pointed out that an instruction for simple murder was not proper, as this was a premeditated murder which occurred during the course of a robbery. Furthermore, the State noted that an instruction for manslaughter was not proper in the light of the fact that Howell presented an alibi defense. Howell filed a notice of his alibi defense which stated that at the time of the offense he was at his home in New Albany, Mississippi, and listed James Howell and Miriam Howell as alibi witnesses.

¶135. Instruction D-13 provided:

If you fail to find the defendant, Marlon Howell, guilty of capital murder, then you should continue your deliberations to consider the elements of the felony crime of simple murder. If you find from the evidence in this case beyond a reasonable doubt that Marlon Howell on or about May 15, 2000, in Union County, Mississippi, killed David Pernell, a human being in the commission of an act imminently dangerous to others and evidencing a depraved heart, regardless of human life, without authority of law, even though the defendant had no premeditated design to affect the death of any particular individual, then you should find the defendant, Marlon Howell, guilty of murder. If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you should find the defendant, Marlon Howell, not guilty of murder.

52

If you fail to find the defendant, Marlon Howell, guilty of simple murder, then you should continue your deliberations to consider the elements of the felony crime of manslaughter.

If you find from the evidence in this case beyond a reasonable doubt that:

1. Marlon Howell on or about May 15, 2000, in Union County, Mississippi;
2. Killed David Pernell;
3. By gunshot; and
4. Marlon Howell was negligent or act with wanton disregard for human life, and the negligence was so gross as to be tantamount to a wanton disregard of, or utter indifference to the safety of human life; and
5. Such negligence or wanton disregard, if any, directly caused the death of David Pernell, then you shall find the defendant guilty of manslaughter.

If the prosecution has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find the defendant not guilty.

¶136. The trial court refused jury instructions D-13 and S-3 after the following exchange transpired on the record:

Defense:    Now 13 is the one that ... pertains to the simple murder and I think the State's S-3 that was previously submitted and withdrawn would be a better instruction on the simple murder. However, the last paragraph concerning the felony of manslaughter we would ask that that be joined with S-3 or if the court determines that manslaughter is not proper then we are submitting that simple murder is proper. I don't want a commingle with what manslaughter and the other and have them both effectively removed. I think it's a case by case situation.

State:  We object to both request for a murder and manslaughter instruction. We object to a simple murder instruction and we object to a man slaughter instruction because neither of those instructions are supported by the evidence. We don't we couldn't prove simple murder if we wanted to. We don't have any. We don't have any intent. The murder to prove a simple premeditated murder. So, that is why I say that it's not a murder. This instruction is not supported by the facts of this case. They didn't know the victim so obviously he didn't have any other then to rob them and kill him other than the robbery motive. So therefore we are saying that there is not evidence of premeditation and deliberate design which is a necessary element to prove simple murder. Whereas the evidence is sufficient to prove capital murder. And I believe the same thing would

go for a manslaughter instruction if the instruction they have submitted is based upon negligence, gross culpable negligence manslaughter. We disagree that they should be entitled to that instruction because if you are committing the crime of armed robbery and regardless of whether it's negligence or whatever, whatever this case is whether it's with or with out deliberate design and you kill some one you are guilty of capital murder and not manslaughter.

Defense:      Judge, I agree with him but the point that I think is going to be argued strongly by us is there is no proof of a robbery.

The Court:    They are putting their burden on that.

Defense:      But then they say well there is no proof of a robbery but we think he shot this man what is the jury going to do then.

State:        Their defense is not that this man shot him. There defense is alibi.

Defense:      We are entitled to bring up whatever defenses we want. Mr. Rice testified there was absolutely nothing to believe there was a robbery going on. This jury can find that this man was there and did shoot Mr. Rice. But that, I mean Mr. Pernell but based on Mr. Rice's testimony there was no robbery going on and therefore whatever for whatever reason he shot him it's manslaughter.

The Court:    I'm going to refuse the instruction....

¶137. Howell also submitted jury instruction D-18, a simple murder instruction, which was also refused by the trial court. Instruction D-18 provided:

The Court instructs the jury that if you find the defendant, Marlon Latodd Howell, not guilty of "capital murder" as charged in the indictment, then you should continue your deliberation to determine whether the defendant, Marlon Latodd Howell, has committed the lesser crime of "simple murder."

The crime of "simple murder" is distinguished from the crime of "capital murder" by the absence of, or by the failure of the State to prove, the following element of the offense of "capital murder," to wit:

the defendant, Marlon Latodd Howell, did kill the said Hugh David Pernell at a time when the said Marlon Latodd Howell was engaged in the commission of the crime of robbery of the said Hugh David Pernell.

THEREFORE, if you find from the evidence under this case beyond a reasonable doubt that:

1)      Hugh David Pernell was a living human being; and

54

2)     the defendant, Marlon Latodd Howell, did kill the said Hugh David Pernell in Union County, Mississippi, on or about the 15th day of May, 2000; and

3)     the defendant, Marlon Latodd Howell, acted unlawfully, willfully, and feloniously, without authority of law, and with the deliberate design to effect the death if Hugh David Pernell, then you shall find the defendant, Marlon Latodd Howell, guilty of capital murder.

If you fail to find the defendant, Marlon Howell, guilty of simple murder, then you should continue your deliberations to consider the elements of the felony crime of manslaughter.

If you find from the evidence in this case beyond a reasonable doubt that:

1.     Marlon Howell on or about May 15, 2000, in Union County, Mississippi;
2.     Killed David Pernell;
3.     By gunshot; and
4.     Marlon Howell was negligent or acted with wanton disregard for human life, and the negligence was so gross as to be tantamount to a wanton disregard of, or utter indifference to the safety to human life; and
5.     Such negligence or wanton disregard, if any, directly caused the death of David Pernell, then you shall find the defendant guilty of manslaughter.

If the prosecution has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find the defendant not guilty.

¶138. On appeal, Howell specifically argues that:

The jury could have found and returned the lesser-included offense of simple murder or manslaughter. The fact remains that if this jury had believed Howell approached Pernell's vehicle to sell him drugs and was sprayed in the face with mace by Pernell in reaction, then they could have returned a conviction on manslaughter. The [c]ourt's failure to instruct the jury on the lesser included offense of simple murder and manslaughter was error. The jury as instructed had no choice but either to turn Howell loose or convict him of [c]apital murder...

¶139. However, we find that Howell's argument that the trial court erred by not granting instructions S-3, D-13 and D-18 as to both simple murder and manslaughter, is contradicted

by the evidence in the record. The facts of this case clearly do not support or warrant such instructions. In ***Presley v. State***, 321 So.2d 309, 310 (Miss. 1975), this Court said:

> The method of submitting an instruction dealing with a lesser-included offense varies with each case. In some cases it may be sufficient simply to point out that the lesser offense is the same except for the absence of some specific element. In others it may be necessary to include all the essential elements of the included offense as was done for the principal charge. However, the jury should not be instructed as to a lesser-included offense in such a way as to ignore the primary charge as this would be confusing to the jury. It is also true that if the evidence does not justify submission of a lesser-included offense, the court should refuse to do so. Unwarranted submission of a lesser offense is an invitation to the jury to disregard the law.

*See **Grace v. State***, 375 So.2d 419, 420 (Miss. 1979).

¶140. We find that this assignment of error is without merit.

## XV.    Instruction D-3, Weight of Evidence

¶141. Howell argues that the jury should have been instructed as to the weight and quality of the evidence. Specifically, Howell contends that the trial court erred in refusing his proposed jury instruction D-3, which provided:

> Each person testifying under oath is a witness. You have the duty to determine the believability of the witnesses. In performing this duty, you must consider each witness' intelligence, the witness' ability to observe and accurately remember, the witness' sincerity, and the witness' demeanor while testifying. You must consider also the extent the witness is either supported or contradicted by other evidence; the relationship the witness may have with either side; and how the witness might be affected by the verdict. You must consider any evidence of the witness' character for truthfulness.
> In weighing a discrepancy by a witness or between witnesses, you should consider whether it resulted from an innocent mistake or a deliberate falsehood, and whether it pertains to a matter of importance or an unimportant detail.
> You may reject or accept all or any part of a witness' testimony and you may reject part and accept other parts of a witnesses' [sic] testimony.
> After making your own judgment, you will give the testimony of each witness the credibility, if any, as you may think it deserves.

The weight of the evidence is not necessarily determined by the number of witnesses testifying as to the existence or nonexistence of any fact. You may find that the testimony of a smaller number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

¶142. In *Humphrey v. State*, 759 So.2d 368, 380 (Miss. 2000), this Court stated:

Jury instructions are to be read together and taken as a whole with no one jury instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

(citing *Heidel v. State*, 587 So.2d 835, 842 (Miss. 1991)). *See also* *Austin v. State*, 784 So.2d 186, 193 (Miss. 2001).

¶143. Instructions that comment on the weight of the evidence are not proper. *Id.* at 193. Specifically, instructions that direct jurors' attention to the quality or weight of the evidence have been condemned by this Court. *See* *Hentz v. State*, 489 So.2d 1386, 1387 (Miss. 1986).

¶144. Through Instruction C-1, the trial court instructed these jurors were the sole judges of credibility in this case. Instruction C-1 further stated the jury had the exclusive province to determine what weight and credibility to assign the testimony and supporting evidence of each witness.

¶145. The jury was also instructed to view the evidence as a whole when determining whether reasonable doubt existed. Instruction D-2 further provided that:

The [c]ourt instructs the jury that you are bound in deliberating upon this case, to give the defendant the benefit of any reasonable doubt of the defendant's guilt that arises out of the evidence or want of evidence in this case. It is only when, after examining the evidence on the whole, you are able to say on your oaths, beyond a reasonable doubt, that the defendant is guilty that the law will permit you to find him guilty. You might be able to say that you believe him to be

57

guilty, and yet, if you are not able to say on your oaths, beyond a reasonable doubt, that he is guilty, it is your sworn duty to find the defendant "Not Guilty."

¶146. Additionally, the jury was instructed to view the accomplice testimony with suspicion and distrust. Instruction D-5 provided as follows:

> The [c]ourt instructs the jury that the law looks with suspicion and distrust on the testimony of an alleged accomplice and requires the jury to weigh the same with great care, caution, and suspicion. You should weigh the testimony from alleged accomplices, and passing on what weight, if any, you should give this testimony, you should weigh it with great care and caution, and look upon it with distrust and suspicion.

¶147. The jury was further instructed that they could disregard testimony contradicted by inconsistent evidence. Instruction D-7 provided as follows:

> In determining the credibility of particular testimony, you should also consider the extent to which the testimony was impeached. A witness may be impeached by disproving the facts to which the witness testified; by proof of general bad character; and by proof of contradictory or inconsistent prior statement or statements made by the witness. To access [sic] the importance of inconsistency or contradictory testimony or statements you should determine:
>
> 1. If such testimony is given or if such statements were made;
> 2. Whether they are in fact in consistent [sic] with or contradictory to the witness' present testimony; and
> 3. Whether or not the testimony or statements are material to the witness' testimony in the case.
>
> If you find that a witness has been impeached by proof of previous contradictory or inconsistent testimony or statements, you may disregard that testimony. You may also consider that impeachment as being relevant to your determination of the weight to be afforded the balance of the witness' testimony.

¶148. "A trial judge is under no obligation to grant redundant instructions. The refusal to grant an instruction which is similar to one already given does not constitute reversible error."

*Montana v. State*, 822 So.2d 954, 961 (Miss. 2002). "The refusal to grant an instruction

which is similar to one already given does not constitute reversible error." *Id*. In *Bell v. State*, 725 So.2d 836 (Miss. 1998), this Court stated that:

> The trial judge is under no obligation to grant redundant instructions. *Davis v. State*, 568 So.2d 277, 280-81 (Miss. 1990). Indeed, to do so can only create confusion and make it more difficult for the jury to understand the charge. When the instructions are read as a whole, as indeed they must be, we find no error in the refusal of these specific requested instructions.

*Bell*, 725 So.2d at 849-49.

¶149. We find that the record reflects that Howell was given numerous jury instructions on their role in gauging witness credibility. The jury was given instructions D-2, D-5 and D-7 which advised them how to view the evidence as a whole, accomplice testimony and inconsistent statements or testimony. Howell's instruction D-3 was properly denied. This issue is without merit.

### XVI. Instruction D-8, Testimony of Law Enforcement Officer

¶150. Howell contends that the trial court erred in denying proposed jury instruction, D-8, which provided:

> The testimony of a law enforcement officer should be considered by you just as any other evidence in the case. In evaluating his or her credibility you should use the same guidelines which you apply to the testimony of any witness. In no event should you give greater or lesser credence to the testimony of any witness merely because he or she is a law enforcement officer.

¶151. This Court has soundly and repeatedly rejected this argument:

> Austin argues that the trial court erred by refusing his request for "level playing field" jury instruction–that is, one that noted that the testimony of a police officer is not entitled to greater weight than any other witness. The requested instruction would have advised the jury that:
>
> > The testimony of a law enforcement officer should be considered by you just as any other evidence in the case. In evaluating his or

her credibility you should use the same guidelines which you apply to the testimony of any witness. In no event should you give either greater or less credence to the testimony of any witness merely because he or she is a law enforcement officer.

The trial court refused the instruction because it was duplicitous of another instruction that had already been granted.

This Court has previously held that the very same instruction offered by Austin was properly refused. *See Stewart v. State*, 355 So.2d 94, 96 (Miss. 1978); *Washington v. State*, 341 So.2d 663, 664 (Miss. 1977). The Court recently reiterated its stance in *Hansen v. State*, 592 So.2d 114, 139 (Miss. 1991), noting that the trial court had given the jury the following general instruction:

> As sole judges of the facts in this case, your exclusive province is to determine what weight and what credibility will be assigned the testimony and evidence of each witness in this case. You are required to use your common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified in this case.

*Id*. at 140. This same instruction was granted in the case sub judice. *Hansen* further stated that:

> Our law of criminal procedure has long perceived dangers in comments upon the evidence, and in that regard we have for years had a statute, Miss. Code Ann. § 99-17-35 (1972), which reads in pertinent part: The judge in any criminal cause, shall not sum up or comment on the testimony, or charged the jury as to the weight of evidence.... It is certainly true that of late our attitude toward comments upon the evidence may have relaxed, *see Nichols v. Munn*, 565 So.2d 1132, 1136-37 (Miss. 1990); *Weaver v. State*, 497 So.2d 1089, 1094 (Miss. 1986), but not so much that we will require the instruction at issue. We affirm on this issue.

*Id*. at 141.

Though Mississippi law is clear on this issue, Austin nonetheless argues that the refusal of the trial court to "level the playing field" resulted in a denial of his right to due process. Austin argues that courts routinely act contrary to the holdings in *Stewart*, *Washington*, and *Hansen* by granting cautionary instructions regarding informant testimony. It is true that where the State's case is based upon the testimony of an accomplice, corroborated only by a

60

confidential informant, the trial court must grant a cautionary instruction. See *Edwards v. State*, 630 So.2d 343, 344 (Miss. 1994); *Parker v. State*, 378 So.2d 662, 663 (Miss. 1980). The policy behind granting a cautionary informant instruction, however, is based on the fact that informant or accomplice testimony, by its very nature, is looked upon with suspicion and distrust. This rationale does not extend to police officer testimony.

*Austin v. State*, 784 So.2d at 193.

¶152. As discussed in issue XV, we find that the trial court properly instructed the jury on how to weigh the credibility of each and every witness. The trial judge did not abuse his discretion in refusing Howell's instruction D-8, distinguishing the testimony of law enforcement officers from that of any other witness. *See Austin*, 784 So.2d at 193. Accordingly, we find that Howell's assignment of error is without merit.

## XVII. Instruction D-16, Cross-Racial Eyewitness Identification

¶153. Howell argues that the trial court erred in denying proposed instruction D-16 pertaining to eyewitness identification by a member of a different race. Instruction D-16 provided:

In this case the identifying witness is of a different race than the defendant. In the experience of many, it is more difficult to identify members of a different race than members of ones own. If this is also your own experience, you may consider it in evaluating the witness' testimony. You must also consider, of course, whether there are other factors present in this case which overcome any such difficulty of identification. For example, you may conclude that the witness has had sufficient contacts with members of a different race that he would not have greater difficulty in making a reliable identification.

¶154. Howell submits that this instruction has not been required under the laws of this State, stating that "this issue appears to be one of first impression." The defense contends that the special jury instruction should be required because Rice, a white man, identified Howell, a young black man. In support of his argument, Howell cites *State v. Cromedy*, 727 A.2d 457

(N.J. 1999), where the cross-racial identification in a rape case was not supported by any

corroborating evidence. *Id*. The New Jersey Supreme Court held that:

> "A cross-racial instruction should be given only when, as in the present case, identification is a critical issue in the case, and an eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability."

*Id*. at 467.

¶155.   However, the court in *Cromedy* further provided that:

> Courts typically have refused the instruction where the eyewitness or victim had an adequate opportunity to observe the defendant, there was corroborating evidence bolstering the identification, and/or there was no evidence that race affected the identification. *See Hyatt, supra*, 647 N.E.2d at 1171 (declining instruction in rape and robbery case where victim was terrorized for fifteen to twenty minutes in broad daylight and could see the attacker's face); *see also Commonwealth v. Engram*, 43 Mass.App.Ct. 804, 686 N.E.2d 1080 (1997) (declining instruction where numerous eyewitnesses saw defendant at close range and positively identified him from a line-up and photo array).
>
> A number of courts have concluded that cross-racial identification simply is not an appropriate topic for jury instruction. *See State v. Willis*, 240 Kan. 580, 731 P.2d 287, 292-93 (1987); *Hyatt, supra*, 647 N.E.2d at 1171; *People v. McDaniel*, 217 A.D.2d 859, 630 N.Y.S.2d 112, 113, appeal denied, 87 N.Y.2d 848, 638 N.Y.S.2d 607, 661 N.E.2d 1389 (1995). Those courts have determined that the cross-racial instruction requires expert guidance, and that cross-examination and summation are adequate safeguards to highlight unreliable identifications.
>
> Other jurisdictions have denied the instruction, finding that the results of empirical studies on cross-racial identification are questionable. *See Telfaire, supra*, 469 F.2d at 561-62 (Leventhal, J., concurring) (rejecting cross-racial instruction because data supporting hypothesis is "meager");*People v. Bias*, 131 Ill.App.3d 98, 86 Ill.Dec.256, 475 N.E.2d 253, 257 (1985) (rejecting instruction in robbery case where eyewitness failed to describe key distinguishing facial features and gave inconsistent descriptions because empirical studies are not unanimous). One jurisdiction has even rejected cross-racial identification instructions as improper commentary on "the nature and quality" of the evidence. *See State v. Hadrick*, 523 A.2d 441, 444 (R.I. 1987)

(rejecting such instruction in robbery case where victim viewed perpetrator for two to three minutes at close range during robbery and identified him from a line-up).

*Cromedy*, 727 A.2d at 464-65.

¶156. As discussed at length in the previously addressed issues, Rice's eyewitness identification was not the sole evidence against Howell presented to the jury. The facts clearly demonstrate that corroborating evidence was submitted to the jury, including the testimony of co-defendant, Lipsey, as well as, witnesses, Shaw and Powell. Therefore, we find that *Cromedy* is distinguishable from the facts at hand.

¶157. Furthermore, instruction S-8 given by the trial court instructed the jury about eyewitness testimony.

> The [c]ourt instructs the [j]ury that in reaching your verdict you are to consider all of the evidence concerning the entire case and the circumstances surrounding the crime. One of the issues in this case is the identification of Marlon Latodd Howell is [sic] as the perpetrator of the crime. As with each element of the crime charged, the State has the burden of proving identity beyond a reasonable doubt, and before you may convict Marlon Latodd Howell you must be satisfied beyond a reasonable doubt of the accuracy of the identification of Marlon Latodd Howell. If, after considering all of the evidence concerning the crime and the witness's identification of Marlon Latodd Howell is [sic] as the person who committed the crime, you are not convinced beyond a reasonable doubt that he is the person who committed the crime, then you must find him not guilty.

> Identification testimony is an expression of belief or impression by the witness. You must judge its value and reliability from the totality of the circumstances surrounding the crime and the subsequent identification. In appraising the identification testimony of a witness, you should consider the following:

> 1)     Did the witness have an adequate opportunity to observe the offender?
> 2)     Did the witness observe the offender with an adequate degree of attention?

> 3) Did the witness provide an accurate description of the offender after the crime?
> 4) How certain is the witness of the identification?
> 5) How much time passed between the crime and the identification?
>
> If, after examining all of the testimony and the evidence, you have a reasonable doubt that Marlon Latodd Howell was the person who committed the crime, then you must find Marlon Latodd Howell is not guilty.

¶158. We find that instruction D-16 was properly denied by the trial court. As discussed previously, the trial court properly instructed the jury how to weigh the credibility of each witness that testified. This issue is without merit.

### XVIII.      Motion for Mistrial

¶159. Howell contends that the trial court erred by refusing to grant his motion for mistrial and renewed motion for change of venue.

¶160. "Whether to grant a motion for mistrial is within the sound discretion of the trial court. The standard of review for denial of a motion for mistrial is abuse of discretion." *Pulphus v. State*, 782 So.2d 1220, 1222 (Miss. 2001) (citations omitted); *Spann v. State*, 771 So.2d 883, 889 (Miss. 2000); *Johnson v. State*, 666 So.2d 784, 794 (Miss. 1995); *Hoops v. State*, 681 So.2d at 521. "The failure of the court to grant a motion for mistrial will not be overturned on appeal unless the trial court abused its discretion." *Bass v. State*, 597 So.2d 182, 191 (Miss. 1992).

¶161. Howell alleges that a juror's father sat on the front row of the audience with the Pernell family. The record reflects that Howell waited until the next day to bring the matter to the trial court's attention. Howell made his motion to the trial court after the trial court had ruled on the jury instructions but before the jury was brought back in to receive the instructions.

64

¶162. The record provides:

Defense: Please the court I do have a matter for the record to bring up. Your Honor, yesterday at the conclusion of the defendants case we were advised that juror Michael Reed's father at the close of our case was seated on the front row with the Pernell family and we contend that that would be highly prejudicial to us. His son is sitting on the front row on the jury panel seeing his father with the victim's family. In light of that we ask the court for a mistrial. We think it is further evidence of the proof of the passion and prejudice in this community concerning this case and the inability of this defendant to get a fair trial here. We also, Your Honor, in light of that ask the court to declare a mistrial and to grant a change of venue in support of that I would like to mark a remark for the record news paper articles from the New Albany Gazette. March 30. And the Tupelo Daily Journal dated March 30 as well as a videotape and a transcript of the TV 9 broad cast concerning this particular case. We think these articles and new cast are evidence of the high profile nature of this case and the need for a change of venue.

The Court: Your motion for mistrial will be denied. Motion for change of venue will be denied and the court will address this issue.

Howell did not call any witnesses in support of his motion for mistrial.

¶163. The trial judge called the jury in and read the instructions to the jury. The defense and the State made their closing arguments to the jury. Following closing arguments, the State attempted to respond to Howell's allegations. The State offered to submit the testimony of a bailiff who knew the man in question. The State informed the trial court that the bailiff would testify that the man had not sat with the victim's family as alleged by the defense. In response, the trial court stated that "[t]he court hasn't heard any testimony from anybody, so, I don't think we need to do anything." The record reflects that following this exchange, Howell never objected nor requested that the trial court admonish the jury.

65

¶164. We find the trial court did not abuse its discretion in denying Howell's motion for mistrial. Howell did not submit any proof to support his allegation. Furthermore, Howell did not present any evidence that the jury did not follow the trial court's instructions in rendering its verdict or that he was prejudiced in any way. We also find this issue to be without merit.

## XIX. Prosecutorial Comments in Closing Argument

¶165. Howell contends that the trial court erred by allowing the State to comment on Howell's failure to testify. During the closing argument of the guilt phase of the trial, the prosecutor stated that "If you had an alibi and were accused of capital murder, don't you think you would tell somebody about it. Don't you think you would have given some details. Done something. That is common sense." According to Howell, the prosecutor's statement was a comment on his failure to take the stand. In support of his argument, Howell relies upon the following three cases: *Butler v. State,* 608 So.2d 314, 318 (Miss. 1992) (prosecutor's comment that she "hasn't told you the whole truth yet" and "she has not yet told you the whole truth of the torment she subjected her son to. You still don't know the whole story.", amounted to commenting on the defendant's failure to testify, where the defendant was the only witness to her son's death); *West v. State*, 485 So.2d 681, 688 (Miss. 1985) (prosecutor's comments that defense counsel stated that, "'We decided not to put the [d]efendant on the stand for trial strategy.' Could any of you possibly have a doubt?" and other similar comments amounted to a comment on the defendant's failure to take the stand); and *Randall v. State*, 806 So.2d 185, 211-12 (Miss. 2002) (prosecutorial comments "approached the edge of reversible error" when the prosecution commented on the failure of 24 witnesses for the defense to testify after

66

Randall's objection to the State's improper comment regarding the absence of one witness").

¶166.   The prosecutor's comments in the case sub judice are clearly distinguishable from the line of case law authority cited by Howell.  In *Butler*, the prosecutor commented that the defendant was not telling the whole truth.  *Butler*, 608, So.2d at 318.  Unlike *Butler*, the case at hand had two witnesses testify that Howell shot Pernell.  In *Butler*, the defendant was the only witness to her child's death.

¶167.   In *West*, the prosecutor commented that the defendant did not take the stand for trial strategy purpose but there was "no doubt" as to guilt.  *West*, 485 So.2d at 688.  Again, the prosecutor in the case sub judice did not go to that extreme and speak about a lack of taking the stand.   Instead, the prosecution brought out discrepancies in witnesses' testimony concerning Howell's alleged alibi defense.  The prosecutor commented that common sense would dictate that a defendant would reveal the identity of an alibi when faced with capital murder charges.

¶168.  In *Randall*, this Court found that prosecutorial misconduct was on the edge of reversible error for comments concerning the number of defense witnesses that did not testify at trial.  This Court ultimately reversed the case in *Randall*, but not on that one issue standing alone.  Clearly, no comments of this nature were made by the prosecution at Howell's trial.

¶169.  Attorneys are allowed wide latitude in closing arguments. *Holly v. State*, 716 So.2d 979, 988 (Miss. 1998). The trial judge is in the best a position to determine if an alleged objectionable remark has a prejudicial effect.  *Roundtree v. State*, 568 So.2d 1173, 1177

(Miss. 1990). "The judge is provided considerable discretion to determine whether the remark is so prejudicial that a mistrial should be declared." *Id*. at 1778. This Court has held:

> There is a difference, however, between a comment on the defendant's failure to testify and a comment on the failure to put on a successful defense. Moreover, the State is entitled to comment on the lack of any defense, and such comment will not be construed as a reference to a defendant's failure to testify 'by innuendo and insinuation.'

*Strahan v. State*, 729 So.2d 800, 806 (Miss. 1998) (citations omitted). An alleged improper prosecutorial comment during closing argument must be considered by the appellate court in context in which the statement was made. *Ballenger v. State*, 667 So.2d at 1270. When faced with this type of challenge, the appellate court must determine "whether the comment of the prosecutor can reasonably be construed as a comment upon the failure of [the accused] to take the stand." *Fears v. State*, 779 So.2d 1125, 1129 (Miss. 2001) (quoting *Ladner v. State*, 584 So.2d 743, 754 (Miss. 1991)). The appellate court reviews each comment on a case by case a basis. *Id*. at 1129-30. Taking the comment in context during the sentencing phase of the trial on rebuttal, the prosecution stated the following:

> The defendant's own father. I guess is part of the defense team. He also wanted to attack the chief who went to school with him. You know the lethal piece of evidence in this whole case is the big chief's mouth to think he was stupid enough and the law enforcement officers were stupid enough to believe that he is in Corinth with a whore. Think the cops are just going to go away. That you are going to forget about it. That is how simple minded the defendant is. That is [the] most lethal piece of evidence in this case that I see. Why would you lie. What is the reason. Common sense could make that decision. Why would he lie. Then I suppose that the father would have you believe that the reason the first time he is told anything about this alibi is that of the police are bad. No. I wouldn't tell them. What about the F B I? What about me? What about Judge Coleman. What about somebody instead of the first time any law enforcement is told allegedly that the defendant was there at that house when this crime occurred, when he sat don up here, Does that make common sense, I don't think so. Wouldn't you talk about, you know, with your daughter whether or not what

68

time was it do you remember, did you hear him knock, Remember she head the bell ring, he head the knock, A lot of discrepancies there. Between their testimony, She said they never discussed that. Remember that. Nailed her down on that issue, Never wavered from it. Daddy said they did. Said they discussed and prayed about it and talked about it. But the best he could come up. He never came up with any time just the time he dropped him off at 8:25 a time that he wanted to know about. **If you had an alibi and were accused of capital murder, don't you think you would tell somebody about it. Don't you think you would give some details. Done something. That is common sense.**

(emphasis added).

¶170. When questioned by Chief Grisham, Howell told the officers that he was in Corinth with a woman at the time Pernell was shot. Howell told Chief Grisham that he did not know the woman's name or address, even after the police stressed the importance of verifying his alibi. Mississippi Highway Patrol investigator Mickey Baker also testified that Howell did not provide the woman's name or address. Howell continued to withhold the woman's information when the police told him that they had information of his involvement in the murder. Howell maintained that he was with a woman in Corinth.

¶171. Rev. Howell testified that the door bell rang and he went to the door. He heard his son's voice say, "It is me daddy." Rev. Howell then turned the latch on the door to his home and went back to bed. Rev. Howell never saw Howell. Marion Howell (Marion), Howell's sister, stated that she heard her father get up. She then looked at her pager which had a time of 3:00 a.m. She did not see Howell that night. Despite this testimony at trial, Howell never once mentioned that he had been at his father's home that night. Rev. Howell and Marion never told the police about any of these events either. In fact, Rev. Howell stated that he went to the

police station and inquired about the arrest and charges against his son, but he never told the police that his son was allegedly at home that night.

¶172. In the case sub judice, the prosecutor was summarizing the testimony of the witnesses. He pointed out the conflicts in the alibi testimony of Howell's father and sister.[6] In effect, the comments concerned the lack of a successful alibi defense. This Court in *Strahan v. State*, 729 So.2d at 806, held that the prosecution "is entitled to comment on the lack of any defense, and such comment will not be construed as a reference to a defendant's failure to testify 'by innuendo and insinuation.'" We find that this issue is without merit.

### XX. Cooling off Period

¶173. Howell argues that the trial court erred by failing to grant his motion for a 24 hour cooling off period between the end of the guilt phase and the beginning of the sentencing phase. He claims that the trial court did not make a finding of fact in denying the motion.

¶174. Miss. Code Ann. § 99-19-101(1) (Rev. 2000) states the following in part:

> Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. The proceeding shall be conducted by the trial judge before the trial jury **as soon as practicable.**

(emphasis added). Howell cites *McGilberry v. State*, 741 So.2d 894, 919 (Miss. 1999), for authority for his position. In *McGilberry*, this Court held that the trial court did not abuse its discretion by denying a motion for a 12 hour cooling off period. *Id*. The trial court denied the

---

[6] During closing argument, the defense commented on Rev. Howell and Marion's testimony. The prosecutor merely rebutted and commented on the defense's closing argument. The defense spoke at great length that neither witness lied to the jury but only stated the facts as they knew them.

motion noting that the jury had eaten lunch, it was the middle of the day, and there was no reason to grant a cooling off period. *Id*. Consequently, the defense had a 15 minute recess between the jury verdict and the sentencing phase of the trial. *Id*.

¶175. Trial judges normally have broad discretion in their decision on the time to begin a trial and the length of the proceedings each day. *Hooker v. State*, 716 So.2d 1104, 1112 (Miss. 1998). *See also Conley v. State*, 790 So.2d 773, 798 (Miss. 2001) (upheld the denial of a 12 hour cooling off period where there had been a 30 minute recess between the guilt and sentencing phase of a capital murder).

¶176. After a short recess of approximately 15 minutes, defense counsel renewed its motion to the trial court for a 24 hour cooling off period between the guilt and sentencing phase. Counsel presented no argument to support of the cooling off period. The trial court denied the motion.

¶177. Even in his brief, Howell offers no valid reason to grant the motion. Miss. Code Ann. § 99-19-101(1) requires that a separate sentencing proceeding shall be conducted as soon as practicable. The trial court has discretion in determining the length of proceedings each day. *Hooker v. State*, 716 So.2d at 1112. Further, Mississippi has not adopted a statutorily mandated cooling off period between the guilt and sentencing phase of trial. *See Conley v. State*, 790 So.2d at 798.

¶178. We find that the trial court's denial of the motion was not an abuse of discretion. Howell never showed why the motion for a cooling off period was necessary nor how the denial of the motion was improper or an abuse of discretion. The applicable statute requires a separate sentencing proceeding to be conducted as soon as practicable. Miss. Code Ann.

71

§ 99-19-101(1). This Court has upheld a 15 minute recess. *See McGilberry*, 741 So.2d at 919. The trial court in its discretion determined that the sentencing phase could begin the same day that the verdict was returned by the jury. This issue is without merit.

### XXI. Prior Conviction as an Aggravating Factor

¶179. Howell argues that the use of the aggravating factor "under sentence of imprisonment" amounts to reversible error. In *Grayson v. State*, 806 So.2d at 252, this Court held that "[t]he legislature's intent was to protect the citizenry from the evil of the lesser felony by imposing a greater penalty upon a homicide occurring during its commission." *Id*. at 252. Miss. Code Ann. § 99-19-101(5)(a) provides in pertinent part:

> (5) Aggravating circumstances shall be limited to the following:
>
> (a)    The capital offense was committed by a person under sentence of imprisonment

Howell contends that the legislative intent of this language "under sentencing of imprisonment" in Miss. Code Ann. § 99-19-101(5)(a) was to deter *inmates* from committing murder while in *custody*. He claims that the fact that a felon is on probation or even off probation for a non-violent crime should not be considered as an aggravating factor in whether to impose the death penalty.

¶180. On numerous occasions, this Court has held that the aggravating circumstances language "under sentencing of imprisonment" applies to unincarcerated felons. In *Evans v. State*, 422 So.2d 732, 741 (Miss. 1982), this Court held that "under Mississippi statutes and decisions, when a person has been convicted and placed on probation, particularly here, where four (4)

years of a five-year sentence were suspended, such sentence is a sentence under imprisonment."

¶181. In *Brown v. State*, 798 So.2d 481, 492 (Miss. 2001) this Court held that "[i]t has been held that one who is under a suspended sentence is "under sentence of imprisonment" for purposes of finding the aggravating circumstance listed at Miss. Code Ann. § 99-19-101(5)(a)." Brown was convicted of aggravated assault, sentenced to a ten year term in prison, the sentence was suspended and he was placed on probation. *Id.* Later, one year of the sentence was revoked, however, the rest of the sentence was not revoked. *Id*. *See also Cole v. State*, 666 So.2d at 777 (serving a suspended sentence pursuant to a grand larceny conviction at the time the murder was committed was considered a sentence of imprisonment); *Lockett v. State*, 517 So.2d at 1336-37 (probated sentence meets the "under sentence of imprisonment" terms for purposes of finding the aggravating circumstance pursuant to Miss. Code Ann. § 99-19-101(5)(a)).

¶182. In the case sub judice, Officer Nance testified at the sentencing phase concerning Howell's prior sentence for possession of a controlled substance, a non-violent crime. He stated that a person on house arrest, a.k.a. intensive supervision program, is considered an inmate of the State. Howell was sentenced on March 3, 1999, to the intensive supervision program for three years. The first year of the sentence was to be served on house arrest and upon completion, Howell would then be placed on post-release supervision for two years. According to Officer Nance, the intensive supervision program is in lieu of transporting a defendant to the State penitentiary at Parchman. If a defendant violates the conditions and terms of the program, then the person is taken directly to Parchman. On February 11, 2000,

73

Howell was transferred from the intense supervised program to post-release supervision in Tippah County. Pernell was shot on May 15, 2000.

¶183. Our precedents clearly permit the aggravating factor "under sentence of imprisonment" pursuant to § 99-19-101(5)(a) to include probated, paroled, and suspended sentences. Accordingly, we find that this issue is without merit.

## XXII. Pecuniary Gain

¶184. Howell next argues that the trial court erred by allowing Officer Nance to testify to the fee payment schedule for probationers. He complains that the prosecution used the same pecuniary gain or motive at trial and during the sentencing phase to provide an aggravating factor for the jury.

¶185. The State argues that Howell is procedurally barred from raising this issue as he failed to raise this objection at the sentencing hearing. We agree. The following exchange between the State and Officer Nance indicates that the defense objected on the grounds of the imprisonment issue pursuant to Miss. Code Ann. § 99-19-101(5)(a):

| | |
|---|---|
| Defense: | This is a conviction, Judge the record I would want to object to this being used as an aggravating circumstance because it's not a conviction involving violence or the propensity for violence. We contend that he was under a sentence where he was on probation and not under a sentence of imprisonment and that is a distinction and that this conviction could not be used as an aggravating factor. |
| The Court: | All right. All right, Mr. Hood. |
| State: | Your Honor, first of all the State would move to reintroduce for the juries consideration all the evidence introduced and presented to the jury for oral testimony for their consideration during the sentencing phase. |
| The Court: | All right, sir. Let it be so admitted. |

After questioning Officer Nance for a short period of time, the defense objected again for the purpose of their argument concerning imprisonment, not pecuniary gain. The following occurred:

> Q.        What about these fees that people on the probation have to pay to their probation officer. What fees are those?
>
> Defense:      We are going to interpose and objection on top of the previous objection we made at this bench. That is not part of the proof that he had a sentence of imprisonment.
> The Court:    Where are we going.
> State:        Trying to determine the pecuniary gain, Your Honor.
> The Court:    Go ahead?

"If no contemporaneous objection is made, the error, if any, is waived." ***Walker v. State***, 671 So.2d 581, 597 (Miss. 1995) (citing ***Foster v. State***, 639 So.2d at 1270). This Court finds that the issue is procedurally barred.

¶186. Procedural bar aside, Howell's argument is also without merit. Officer Nance testified that a probationer had to pay a $25 monthly supervision fee and an extra $10 if a probationer fails a drug test. The prosecution in this case submitted an instruction which combined the pecuniary gain and the robbery into one aggravating factor. The portion of the instruction read as follows: "The capital offense was committed for pecuniary gain during the course of robbery." Thus, the instruction was given as one aggravating factor and not as separate factors.

¶187. In ***West v. State***, the defense argued that the capital punishment statute is unconstitutional because "it fails to provide a principled distinction of death-eligible felony murderers, since the underlying felony is used both to elevate the defendant into the death-eligible class as well as to subsequently aggravate his felony murder conviction." ***West***

*v. State*, 725 So.2d 872, 894 (Miss. 1998). The Court in *West* stated that this "argument has been squarely rejected by this Court in *Ballenger v. State*, 667 So.2d at 1260-61, which noted that where the class is appropriately narrowed through legislative definition of the capital offenses, further narrowing is not required at the weighing stage." 725 So.2d at 895.

¶188. In *Turner v. State*, 732 So.2d 937, 954-55 (Miss. 1999), this Court upheld a jury instruction which combined the pecuniary gain aggravator with an armed robbery. This Court held that:

> In sentencing instruction number one, only one aggravating factor was offered for the jury's consideration:
>
> > 1.     The capital offense was committed for pecuniary gain during the course of an armed robbery.
>
> Turner contends that under *Willie v. State*, 585 So.2d 660, 680-81 (Miss.1991), this Court will not allow the jury "the opportunity to doubly weigh the commission of the underlying felony and the motive behind the underlying felony as separate aggravators." Turner alleges that in the present case sentencing instruction number one violated the spirit, if not the exact letter of the law.
>
> In *Jenkins v. State*, 607 So.2d 1171, 1182 (Miss.1992), this Court held, "in *Willie*, we clearly rejected the use of robbery and pecuniary gain aggravators finding that they were, in essence, just one." *See also Ladner v. State*, 584 So.2d 743, 762 (Miss.1991); *Willie v. State*, 585 So.2d 660, 680-81 (Miss.1991).

*Turner*, 732 So.2d at 954-55. The jury instruction in this case is exactly the same as that given in *Turner*, albeit one was in the course of "armed robbery" while the other was "robbery." Accordingly, this issue is without merit.

### XXIII.     Introduction of a Prior Indictment

¶189. Howell contends that the trial court erred by allowing the State to introduce an indictment against him for the sale of a controlled substance. He argues that the indictment was not relevant and was highly prejudicial. Further, he relies on *Eubanks v. State*, 419 So.2d 1330 (Miss. 1982) (simple assault case) and **Black v. State**, 418 So.2d 819 (Miss. 1982) (burglary), for the general legal principle that trial testimony is confined to the charges for which the defendant is accused and must stand trial.

¶190. We previously discussed in issue XXI whether Howell was "under sentence of imprisonment" for the conviction of possession of a controlled substance at the time of the crime and its use as an aggravating factor. The fact of the matter is that Howell was actually indicted on a charge of *sale* of a controlled substance; however, he pled guilty to the reduced charge of *possession* of marijuana. On direct examination, Officer Nance testified that Howell was sentenced for possession of a controlled substance. On redirect examination, Officer Nance also stated that the original indictment was for the sale of a controlled substance, that being, marijuana.

¶191. The State argues that Howell's claim is procedurally barred for failure to cite relevant authority, that being, Howell relies upon two non-death penalty cases. We agree and in addition Howell has not provided any authority to support his argument that the indictment was not relevant and that it was highly prejudicial.

¶192. Procedural bar aside, this issue is still without merit. The State argues that the indictment was necessary to rebut the mitigator submitted by Howell that he has no significant history of prior criminal history. Further, the State maintains that the indictment was offered

to demonstrate the validity of the sentencing order and rebut the mitigating evidence presented by Howell.

¶193.  Indeed, this Court held that "[t]he State is allowed to rebut mitigating evidence through cross-examination, introduction of rebuttal evidence or by argument." *Wiley v. State*, 750 So.2d 1193, 1202 (Miss. 2000) (quoting *Turner v. State*, 732 So.2d at 950).

¶194.  As previously mentioned in Issue XXI, Officer Nance testified that Howell was "under sentence of imprisonment" pursuant to § 99-19-101(5)(a).  On cross-examination, defense counsel asked the following questions:

| | |
|---|---|
| Defense: | Mr. Nance, the crime for which [Marlon] Howell was charged, he pled guilty; is that correct? |
| Officer Nance: | Yes, sir. |
| Defense: | There was no trial or finding by jury.  He came here and entered a guilty plea? |
| Officer Nance: | Yes, sir. |
| **Defense:** | **And that was to possession of a controlled substance?** |
| **Officer Nance:** | **That is what the order shows.** |
| **Defense:** | **Did it reflect what the controlled substance was?** |
| **Officer Nance:** | **The order does not say.** |
| **Defense:** | **Do you have personal knowledge of what the controlled substance was?** |
| **Officer Nance:** | **I do not.** |
| **Defense:** | **Do you have any documents reflecting what it was?** |
| **Officer Nance:** | **I don't have any with me.  I was never his supervising officer.  He went directly to the intensive supervision program.** |
| Defense: | This is the only on [sic] criminal conviction that you have a record of on Marlon Howell? |
| Officer Nance: | That is the only thing that I know of personally. |
| Defense: | Mr. Nance, **this particular crime that you have testified to is not one of violence.** |
| **Officer Nance:** | **No, sir.** |
| Defense: | As I understand under this supervision release program Mr. Howell was actually never sentenced to serve a term in Parchman was he? |
| Officer Nance: | Yes, sir.  He was sentenced to serve a term in Parchman. |

78

| | |
|---|---|
| Defense: | I understand he was sentenced to serve three years? |
| Officer Nance: | Yes, sir. |
| **Defense:** | **My question is was he ever sentenced to go to Parchman?** |
| Officer Nance: | He was placed in the Intensive Supervision Program in lieu of transporting him to Parchman with the conditions that if he violated any of the terms and conditions of the Intensive Supervision Program he would be taken directly to Parchman. |
| Defense: | He was released on his house arrest on February 11th of 2000? |
| Officer Nance: | Yes, sir. |
| Defense: | So he was released actually before his year was up? |
| Officer Nance: | Yes, sir the court retained a 365 day right of review of him. |

(emphasis added). The testimony that the defense elicited from Officer Nance was that (1) Howell was convicted of possession of a controlled substance; (2) the type of controlled substance was unknown to Officer Nance; (3) Howell pled guilty to a non-violent crime; and (4) whether the crime was punishable by a sentence to the penitentiary was called into question.

¶195. Clearly, the defense opened the door to redirect examination questions concerning the type of controlled substance in Howell's possession. The indictment indicated that the substance was marijuana. Furthermore, the indictment also stated that the punishment for sale of a controlled substance was imprisonment. Any question concerning whether Howell had a significant history of prior crime was resolved when the defense asked Officer Nance about Howell's prior crime. The indictment and testimony from Officer Nance concerning Howell's criminal history was offered to rebut the defense's inference that Howell's prior crime was insignificant and did not warrant time served in the penitentiary. The indictment showed that the cause numbers in the indictment and the sentencing order were the same and that Howell

79

pled to a lesser offense of possession. Further, the indictment pinpointed the specific controlled substance that was the basis for the charge against Howell. Accordingly, this issue is without merit.

### XXIV.        Sentencing Instruction S-2

¶196. Howell contends that the trial court erred by giving sentencing instruction S-2 which allegedly removed sympathy and mercy from the jury's consideration. He also alludes to the trial court refusing all of his sentencing instructions. Actually, Howell submitted one sentencing instruction, D-1, which comprised thirty-six pages of text. The trial court denied the instruction, but it stated that part of Howell's proposed instruction was incorporated into other instructions. This argument will be addressed more fully in the next issue.

¶197. There are two portions of Howell's proposed sentencing instruction D-1 that he argues contained proper mitigation language. Section three of sentencing instruction D-1 provided:

> A mitigating circumstance is a fact which does not excuse the crime but which, in fairness and in <u>mercy</u>, you should consider as a reason to impose a sentence of life imprisonment rather than death. Marlon Howell does not have to prove the existence of mitigating circumstances beyond a reasonable doubt. Rather, you should find a mitigating circumstance to exist if there is any evidence in support of it. Furthermore, you, as individual jurors, must consider mitigating circumstances. Therefore, even if all other eleven jurors find that a certain mitigating circumstance does not exist, if you believe it does exist, you must find that mitigating circumstance, and weigh it in your further deliberations.

(emphasis added). Section five of the sentencing instruction D-1 provided:

> Finally, each individual juror must decide whether death or life in prison is the appropriate punishment for this crime and for Marlon Howell. Even if aggravating factors outweigh mitigating factors, the law permits the jury to impose a sentence of life imprisonment out of <u>mercy</u> or a determination that life imprisonment is sufficient punishment under the circumstances.

80

(emphasis added). Jury instructions are within the sound discretion of the trial court. *Goodin v. State*, 787 So.2d at 657. In *Goodin*, this Court addressed the issue of mercy instructions and held:

> This Court has repeatedly held that "capital defendants are not entitled to a mercy instruction." *Jordan v. State*, 728 So.2d 1088, 1099 (Miss.1998) (citing *Underwood v. State*, 708 So.2d 18, 37 (Miss.1998); *Hansen v. State*, 592 So.2d 114, 150 (Miss.1991); *Williams v. State*, 544 So.2d 782, 788 (Miss.1987); *Lester v. State*, 692 So.2d 755, 798 (Miss.1997); *Jackson v. State*, 684 So.2d 1213, 1239 (Miss.1996); *Carr v. State*, 655 So.2d 824, 850 (Miss.1995); *Foster v. State*, 639 So.2d 1263, 1299-1301 (Miss.1994); *Jenkins v. State*, 607 So.2d 1171, 1181 (Miss.1992); *Nixon v. State*, 533 So.2d 1078, 1100 (Miss.1987)). "The United States Supreme Court has held that giving a jury instruction allowing consideration of sympathy or mercy could induce a jury to base its sentencing decision upon emotion, whim, and caprice instead of upon the evidence presented at trial." *Id.* (citing *Saffle v. Parks*, 494 U.S. 484, 492-95, 110 S.Ct. 1257, 1262-64, 108 L.Ed.2d 415 (1990)). However, arguments to the jury are not the same as jury instructions. Miss. Code Ann. § 99-19-101(1) states in pertinent part: "The state and the defendant and/or his counsel shall be permitted to present arguments for or against the sentence of death." Thus, it is appropriate for the defense to ask for mercy or sympathy in the sentencing phase. It is likewise appropriate for the State to argue to "send a message" in the sentencing phase. Again, neither side is entitled to a jury instruction regarding mercy or deterrence.

787 So.2d 657-58. *See also* *King v. State*, 784 So.2d 884, 889 (Miss. 2001) ("It should be noted further that neither side is entitled to a jury instruction regarding mercy or deterrence");

*Wiley v. State*, 750 So.2d 1193, 1204-05 (Miss. 1999). In *Wiley* this Court held:

> [T]he jury received the "catch-all" instruction on mitigating circumstances. That is, the jury was instructed to consider, as a mitigating factor, any other matter, any other aspect of the defendant's character or record, and any other circumstance of the offense brought before them during the trial, which the jury, deemed to be mitigating on behalf of the defendant. "This Court long has accepted the use of a 'catch-all' to encompass any mitigating circumstances not specifically enumerated under Miss. Code Ann. § 99-19-101(6)."

*Wiley*, 750 So.2d at 1205 (citations omitted).

¶198. A portion of instruction S-2 given to the jury stated:

> You have found the defendant, guilty of the crime of [c]apital [m]urder. You must now decide whether the defendant will be sentenced to death or to life imprisonment without parole. In reaching your decision, you may objectively consider the detailed circumstances of the offense for which the defendant was convicted and the character and record of the defendant himself. You must consider and weigh any aggravating and mitigating circumstances, as set forth later in this instruction, but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.

This portion of instruction S-2 amounts to a "catch-all" instruction.

¶199. In *Turner v. State*,732 So.2d at 952, the instruction read to the jury was almost the same. This Court upheld the language in the *Turner* instruction which stated "You should consider and weigh any aggravating and mitigating circumstances, as set forth later in this instruction, but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling." *Turner v. State*,732 So.2d at 952. *See also Evans v. State*, 725 So.2d 613, 690-91 (Miss. 1997); *Holland v. State*, 705 So.2d 307, 351-52 (Miss. 1997). Indeed, this Court held that a defendant is not entitled to a sympathy or mercy instruction and allowing such an instruction results in a jury verdict that is based on "whim and caprice." *Id*. (citing *Holland v. State*, 705 So.2d 307, 351-52 (Miss.1997)). In *Turner*, this Court found that "pity", "mercy" and "sympathy" are synonymous. *Id*. Case law precedent clearly allows an instruction such as that given to the jury in this case. Accordingly, this issue is without merit.

### XXV.  Proposed Sentencing Instruction D-1

¶200. As a continuance of issue XXIV, Howell next contends that the trial court erred by denying his sentencing instruction D-1 and adequate sentencing instruction definitions. He

82

asserts that the jury was precluded from being adequately informed as to the definition of aggravating and mitigating circumstances and the proper use of sympathy and mercy in the sentencing phase. Since the issue of sympathy and mercy were analyzed in the preceding issue, the Court need not address the same issue again.

¶201. No authority was provided by Howell in his brief other than a reference to the *Mississippi Model Jury Instructions Second Edition, Criminal, Mississippi Judicial College, 1999*, to support this entire issue. Accordingly, this issue is procedurally barred. **Simmons v. State**, 805 So.2d 452, 487 (Miss. 2001). S*ee also* **Mitchell v. State**, 792 So.2d 192, 202 (Miss. 2001) (death penalty case where failure to cite any authority for an issue was a procedural bar).

¶202. Notwithstanding the procedural bar, the one sentencing instruction submitted by Howell, as referenced in the preceding issue, contained thirty-six pages of text consisting of twenty-nine sections. Many of the areas of instruction were not relevant to the issues present in Howell's case. In fact, Howell even acknowledged that some of the points were not applicable to his case.

¶203. The trial court incorporated part of Howell's sentencing instruction into the instructions given, stating:

> Now as to the instruction submitted by the defendant, I think the court has taken part of that instruction and incorporated it into some of the instructions that the court has already mentioned

This Court has held the standard of review for jury instructions is as follows:

> [T]he instructions are to be read together as a whole, with no one instruction to be read alone or taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case. However, the trial judge

may also properly refuse the instructions if he finds them to incorrectly state the law or to repeat a theory fairly covered in another instruction or to be without proper foundation in the evidence of the case.

*Thomas v. State*, 818 So.2d 335, 349 (Miss. 2002) (quoting *Humphrey v. State*, 759 So.2d at 380). Furthermore, Howell requested no specific area of instruction to be considered on its own by the trial court, rather the instruction was submitted as a whole.[7] The trial court noted that part of the defense instruction was incorporated into some of the other instructions. ¶204.

As to Howell's assertion that the jury was not adequately informed of the definition of aggravating and mitigating circumstances, the instruction proves otherwise. The instruction read in part as follows:

> **You must consider and weigh any aggravating and mitigating circumstances**, as set forth later in this instruction, but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.
> \* \* \* \*
> Next, to return the death penalty, you must find that the **mitigating circumstances** (*those which tend to warrant the less severe penalty of life imprisonment)* do not outweigh the **aggravating circumstances** (*those which tend to warrant the death penalty).*
>
> Consider only the following **elements of aggravation** in determining whether the death penalty should be imposed:
>
> 1) The capital offense was committed by a person under sentence of imprisonment, probation or parole.
>
> 2) The capital offense was committed for pecuniary gain during the course of a robbery.

---

[7] Howell also comments on what he considers a "disturbing trend in the trial court's refusal to grant defendant's theory of the case instructions and detailed sentencing instructions." In addition, Howell questions why instructions should be shortened when a person's life is at stake. Again, Howell submitted the instruction as a whole and did not ask for any specific instruction to be considered by the trial judge. The trial judge also stated that some of the defense instructions were incorporated into other instructions for the jury. We find that this contention is without merit.

You must unanimously find, beyond a reasonable doubt, that one or more of the preceding aggravating circumstances exists in this case to return the death penalty. If none of these aggravating circumstances are found to exist, the death penalty may not be imposed, and you shall write the following verdict on a sheet of paper:

> "We the jury, find the defendant, Marlon Latodd Howell, should be sentenced to life imprisonment without parole."

**If one or more of these aggravating circumstances is found to exist, then you must consider whether there are mitigating circumstances which outweigh the aggravating circumstance(s). Consider the following elements of mitigation in determining whether the death penalty should be not imposed.**

1) Whether the defendant, Marlon Latodd Howell, has no significant history of prior criminal activity.

2) The age of the defendant Marlon Latodd Howell at the time of the crime.

3) The fact that Marlon Latodd Howell will not be eligible for parole or probation.

4) The sentence of co-defendant Adam Ray and Curtis Lipsey.

5) Any other matter, any other aspect of the defendant's character or record, and any other circumstances of the offense brought to you during the trial of this cause which you, the jury, deem to be mitigating on behalf of the defendant.

If you find from the evidence that one or more of the preceding elements of mitigation exists, then you must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstance(s) you previously found. In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you may impose the death sentence. Should you find that the mitigating circumstance(s) outweigh or overcome the aggravating circumstance(s), you shall not impose the death sentence.

(emphasis added). Clearly, the instruction defined the terms "aggravating" and "mitigating" for the jury as well as the exact elements of each. Indeed, in *Randle v. State*, 827 So.2d 705, 713 (Miss. 2002), this Court upheld instructions similar in form to the instructions at hand. The Court held that the instructions adequately placed the aggravating circumstances and the mitigating circumstances before the jury, clearly explained that the circumstances must be weighed against each other, and the appropriate sentence based upon the result of the weighing process. *Id*. Accordingly, this issue is without merit.

### XXVI. Comments on the Victim, Pernell

¶205. Howell next contends that the trial court erred in allowing the State to refer to the victim in the closing argument. More precisely, Howell argues that the State's remarks comparing the victim, Pernell, to himself were highly inflammatory and prejudicial.

¶206. Counsel has wide latitude when arguing cases. *Wells v. State*, 698 So.2d 497, 506 (Miss. 1997); *Davis v. State*, 530 So.2d at 702. "Where a prosecutor has made an improper argument, the question on appeal is 'whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created.'" *Wells v. State*, 698 So.2d at 507 (citing *Davis v. State*, 530 So.2d 694, 701 (Miss. 1988)). *See also Bell v. State*, 725 So.2d 836, 851 (Miss. 1998) (no error where prosecutor argued that murder victim planned to own his own store and stated that victim's life now was reduced to trial exhibits); *Conner v. State*, 632 So.2d 1239, 1276 (Miss. 1993) (overruled on other grounds) (no error where prosecution referred to victim as a grandmother and not to forget her); *Hughes v. State*, 820 So.2d 8, 12

(Miss. Ct. App. 2002) (no error where the prosecutor asked the jury "to imagine yourself closing your business or home being faced with a shotgun").

¶207. Howell relies upon *Willie v. State*, 585 So.2d 660, 679 (Miss. 1991) for authority to support his position that the trial court erred by allowing the State to comment on the victim in closing argument. However, Howell does not cite any specific language from the State's closing arguments. In *Willie*, the defendant argued that the jury was asked to weigh the value of Willie's life against the victim. *Willie*, 585 So.2d at 679. This Court considered this issue procedurally barred for failure to object at the trial. *Id.* Despite the procedural bar, the Court went on to state that the comment was improper even though it was not considered a victim impact statement and had no bearing on Willie's moral culpability. *Id*. This Court finds that *Willie* is not persuasive to the issue sub judice.

¶208. During Howell's closing argument, Howell's counsel raised a number of points for the jury's consideration before making its decision. In essence, the defense counsel elaborated on how awful the whole situation was for Howell and his family. Defense counsel referenced that Howell was just 20 years old. Defense counsel further mentioned that Howell's family was physically unable to come and testify at the sentencing phase of the trial and that the sentence takes him away from his family. In addition, defense counsel stated that a life sentence for a 20 year old was basically a death sentence.

¶209. After Howell's closing argument, the State made its final arguments to the jury. The State's closing argument emphasized that Howell was trying to "put a guilt trip" on the jury. In addition, the State argued that Howell did not want the jury to consider the victim. The State

asked the jury to compare Howell, who murdered Pernell for money, to Pernell, a retired

postal worker with a family who worked to earn money. Later, the State argued:

> I dare put words in the mouth of the man I never met but I heard a lot about and you heard some about for this witness stand. But I bet you [Pernell] would tell you this. When you consider him to be mean or nice or whatever he would say I would like to see that may lay on death row a long long time. Let him think about what blast across my mind when I saw the fire coming from that barrel.
> * * * *
> Let me bring you back to that second in time before he died to ask what would he say. Did he get a chance to say goodbye to his family. No. What about asking God for forgiveness and mercy? No he died instantly. I expect he would like to see this defendant sit on death row and look down thinking about what will happen to him. Thinking about what the sentence will be like if carried out. I think he would at least want that.

The State also pointed out that by his actions, Howell not only ruined the lives of Pernell's

family, he ruined the lives of his own family. As a final statement, the State requested that the

jury consider the instructions and stated "don't let the guilt trip bother you."

¶210. This Court finds that the State's comments did not create an unjust prejudice against

Howell which resulted in a decision influenced by prejudice. Attorneys have wide latitude in

closing statements. *Wells*, 698 So.2d at 506. In the case sub judice, the State was asking the

jury to be mindful of the facts and not be swayed by a "guilt trip" or sympathy. Further, the

State was arguing aggravating factors by stating that Howell took the money for pecuniary gain

as opposed to working for the money as did Pernell. The State also placed responsibility on

Howell for ruining the lives of all involved. The State asked the jury to follow the instructions

and not allow themselves to be swayed by a "guilt trip." This issue is without merit.

### XXVII. Howell's Post-Trial Motion for a New Trial.

¶211. The trial court conducted a hearing on a motion for new trial. Howell argues that the trial court erred in denying his motion for new trial. Of particular concern, Howell cites to issue I (venue), XIII[8] (guilt phase instruction S-2 concerning whether § 97-3-19 specifically enumerate attempted robbery as an underlying offense for the conviction of capital murder), and XXVI (the prosecution's reference to the victim, Pernell, in the sentencing phase).

¶212. In *Birkley v. State*, 750 So.2d 1244, 1255 (Miss. 1999), this Court held that the standard of review for a post-trial motion is abuse of discretion. "A motion for new trial challenges the weight of the evidence. A reversal is warranted only if the lower court abused its discretion in denying a motion for new trial." *Edwards v. State*, 800 So.2d 454, 464 (Miss. 2001) (citing *Sheffield v. State*, 749 So.2d 123, 127 (Miss. 1999). "This Court will accept as true the evidence which supports the verdict and gives the benefit of all favorable inferences that may be drawn from the evidence to the prosecution." *Jefferson v. State*, 818 So.2d 1099, 1111-12 (Miss. 2002) (citing *Edwards*, 800 So.2d at 465). The appellate court will not order a new trial "unless the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction 'unconscionable injustice.'" *McDowell v. State*, 813 So.2d 694, 699-700 (Miss. 2002) (citing *Crawford v. State*, 754 So.2d 1211, 1222 (Miss. 2000)); *Birkley v. State*, 750 So.2d at 1255; *McNeal v. State*, 617 So.2d 999, 1009 (Miss. 1993).

¶213. This Court has adequately addressed Howell's concerns in its discussion of the prior issues. Further, the trial court did not abuse its discretion in denying the post-trial motion for

---

[8] Howell cites issue XIII concerning guilt phase instruction S-2 in his brief to be of particular concern, however, at the hearing defense counsel argued sentencing phase instruction S-2 in issue XXIV. In either case, this Court had adequately addressed these issues and no further discussion is required.

new trial. No unconscionable injustice is sanctioned by allowing the jury verdict to stand. Looking at all the evidence in the light that is most consistent to the jury verdict, there is substantial evidence in the record that reasonable and fair-minded jurors would have found Howell guilty of capital murder. Accordingly, this issue is without merit.

### XXVIII. Proportionality of the Death Penalty in this Case

¶214. This Court must perform a proportionality review when reviewing a death sentence in a capital case pursuant to Miss. Code Ann. § 99-19-105(3) (Rev. 2000). Section 99-19-105(3) states:

>      (3)     With regard to the sentence, the court shall determine:
>
>              (a)     Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
>
>              (b)     Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;
>
>              (c)     Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and
>
>              (d)     Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

¶215. After reviewing the record in this appeal as well as the death penalty cases listed in the attached appendix, we find that Howell's death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. The evidence is more than sufficient to

90

support the jury's finding of the two statutory aggravating circumstances being namely, a capital offense committed in the course of a robbery for pecuniary gain and by person under a sentence of imprisonment, probation or parole. Further, in comparison to other factually similar cases where the death sentence was imposed, the sentence of death is neither excessive or disproportionate in this case. Finally, we find that the jury did not consider any invalid aggravating circumstances. Therefore, this Court affirms the death sentence imposed in this case.

## CONCLUSION

¶216. Finding no reversible error, we affirm the judgment of the Union County Circuit Court.

¶217. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED.**

**SMITH, P.J., AND CARLSON, J., CONCUR. COBB, J., CONCURS IN PART AND IN RESULT. WALLER, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, C.J., COBB AND CARLSON, JJ. GRAVES, J., JOINS IN PART. GRAVES, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, P.J. DIAZ, J., NOT PARTICIPATING.**

**WALLER, JUSTICE, CONCURRING:**

¶218. While I concur with the majority opinion in the result of an affirmance of Howell's conviction and death sentence, I write to express reservations about an indigent defendant being refused funding for expert services because his attorney was acting pro bono.

¶219. We should encourage members of the Bar to take complex criminal cases pro bono. To deny a defendant what is customarily afforded an indigent defendant simply because counsel is pro bono sends the wrong message to the Bar and will have a chilling effect on attorneys

volunteering to represent indigent defendants accused of capital offenses due to the costs associated with defending a capital case.

¶220. Other jurisdictions have addressed whether an indigent defendant who is represented by private counsel is entitled to public funds to retain an expert. The Delaware Supreme Court has set out a procedure to determine whether an indigent defendant represented by private counsel could receive public funding for expert services. *See Chao v. State*, 780 A.2d 1060, 1063 (Del. 2001). To receive funding, the trial court must determine whether (1) the defendant is indigent; (2) counsel is serving pro bono; (3) it would be inappropriate to require private counsel to withdraw in favor of a public defender; and (4) the services are necessary for adequate representation. *Id*.

¶221. Although a procedure similar to the one given by the Delaware court would not help Howell in the present case because he has shown no prejudice, it would be useful in future cases to encourage members of the Bar to volunteer to represent indigent criminal defendants with the assurance that the necessary tools for an adequate defense will be provided.

**PITTMAN, C.J., COBB AND CARLSON, JJ., JOIN THIS OPINION. GRAVES, J., JOINS IN PART.**

**GRAVES, JUSTICE, DISSENTING:**

¶222. With deference to both my colleague on the circuit court and my colleagues in the majority, I am convinced that three errors below deprived Marlon Latodd Howell of a fair trial. Therefore, I respectfully dissent.

> A. *Failure to find that the State's peremptory strikes of African-American venire members was racially discriminatory.*

92

¶223.  Unfortunately in so many cases voir dire has become an exercise in finding race neutral reasons to justify racially motivated strikes. As Justice Marshall predicted, "[m]erely allowing defendants the opportunity to challenge the racially discriminatory use of peremptory challenges in individual cases will not end the illegitimate use of the peremptory challenge." *Batson v. Kentucky*, 476 U.S. 79, 105, 106 S.Ct. 1712, 1727, 90 L. Ed. 2d 69 (1986) (Marshall, J., concurring). The case sub judice is another example of the improper use of peremptory strikes to exclude African-American jurors.

¶224.  In this case, the State exercised peremptory challenges against Juror No. 34 ("High") and Juror No. 68 ("Wade"),**the only two African-American jurors on the venire** considered by the State for service. The State exercised peremptory challenges on both jurors, thus eliminating any African-American jurors from service in the trial of Howell, an African-American defendant.

¶225.  The State's proffered reason for striking juror High was that he had several arrests and a recent charge for public drunk. The State further indicated that one of the District Attorneys involved in the case had been in an automobile accident in front of High's brother's house and he believed that High had witnessed the accident but refused to tell officers what he had seen. As for juror Wade, the State indicated that there was an arrest warrant in Lee County issued for Wade for receiving stolen property and that Wade had not been forthcoming in his questionnaire as to criminal activity which would have prevented him from being fair and impartial.

¶226.  It is fundamentally unfair  that the reasons proffered by the State were not brought up, discussed with or produced to defense counsel at any time prior to or during voir dire. Further,

93

the matters were never raised during voir dire of jurors High and Wade. Neither High nor Wade was given an opportunity to respond to the truthfulness or accuracy of these allegations. This is exactly the type of information that should be revealed prior to voir dire because without it the defense is denied the opportunity to evaluate and test the veracity and accuracy of the information which the State used as the basis for its challenges. A review of the record reveals that jurors High and Wade were never asked any specific questions by the State regarding the matters which were subsequently used as reasons to strike them.

¶227. In support of its alleged race-neutral reason for striking juror Wade the State produced Exhibit No. "1-A." While the first page of this exhibit refers to Anthony Wade, another last name appearing to be "Haney" was struck from the arrest warrant This exhibit also reflects that this charge was made in 1994 and was later dismissed in justice court without prosecution. This charge could have been dismissed for any number of reasons, one being that the State had charged the wrong person. The State failed to produce this information to defense counsel, failed to ask any questions regarding it, and failed to provide any indicia of reliability. Despite all of these failures, the State was allowed to strike an African-American from the venire. Further, the State presented no documentation to support its contention that juror High "had several arrests" and a recent charge for public drunk or that juror High in fact observed any accident in which the District Attorney had been involved.

¶228. This Court in *Mack v. State*, 650 So.2d 1289, 1298 (Miss. 1994), stated :

> The failure to *voir dire* usually comes in to play when the prosecutor expresses some suspicion or uncertainty about the true situation involving the juror, such as when he "believes" that the juror is related to a criminal, or has been involved in some activities which might engender a negative attitude toward the defendant. This factor is closely related to the lack of an evidentiary basis. Here,

94

the fact that Mitchell was unemployed was reflected in the jury questionnaire. The prosecutor was not acting on a mere suspicion. Still, *voir dire* on this issue may have revealed an explanation for this status which would not have been consistent with assumptions regarding the stability and community values of the unemployed. The failure to conduct *voir dire* must weigh against the state in an evaluation of the bona fides of the proffered reason.

In the *Batson* formulation, the relationship of the reason to the facts of the case is to be considered. The usual role given this circumstance is as another factor tending to show that the proffered reason is pretextual. *See Whitsey* 796 S.W.2d at 714-15; *State v. Slappy,* 522 So.2d 18, 23-24 (Fla.1988). This too, must weigh against the state. Nothing about the facts of this case suggests that a juror's employment status should be an issue.

¶229. This Court, in *Mack*, went on to state that such a failure must be weighed in light of the relative strength of the prima facie case of discrimination. In the case at bar, the defendant was black, the victim was white, the jury seated was all white, and the only two black venire members available for selection were struck by the State. If the State intends to use information obtained outside of the voir dire process, it must make that information available to the defendant before peremptory challenges are made so that the defendant has the opportunity to investigate the truthfulness and accuracy of the reasons given by the State in striking the only black jurors available for service.

¶230. Howell made a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race. Howell has shown that the State failed to articulate the race-neutral explanation to strike the jurors in question and purposely eliminated any black jurors from sitting on a jury in the trial of a case involving a black man accused of killing a white man in a predominately white county. The race-neutral reasons given by the State were unexplored during voir dire and were based upon pretrial investigation of jurors High and Wade to which the defense was not privileged nor apprised of during voir dire examination.

¶231. This Court in *Mack*, 650 So. 2d at 1299, declined to extend then Unif. Crim. R. Cir. Ct. 4.06 to information concerning prospective jurors. However, this Court did indicate that the prosecutor **may not** withhold information concerning a prospective juror which impacts upon the juror's ability to be fair and impartial. Allowing the State to present uncorroborated facts and information to the court in support of its peremptory challenge of black jurors **after** the voir dire process has been completed denies Howell the basic fairness guaranteed under the Constitution and rewards the State for failure to ask any relevant questions of High and Wade. I would urge this Court to expand *Mack*, in recognition of due process, and require pretrial disclosure of information concerning members of the venire and, at a minimum, require the party attempting to exercise the peremptory strike, to question the person who is the object of that strike, before it may challenge them.

> *B. Failure to allow Howell to conduct individual sequestered voir dire of jurors who indicated a predisposition in the case.*

¶232. Prior to trial, defense counsel filed a motion requesting individual sequestered voir dire which the court reserved ruling on pending responses from the venire panel. Defense counsel again requested the right to individually voir dire jurors who had indicated they had read articles or seen information about the case on television and in particular inquire about the facts concerning the alleged motive of robbery and the mention of Howell's previous drug conviction in newspapers. The court denied these requests.

¶233. Howell should have been granted the opportunity to individually voir dire jurors to inquire as to opinions that these jurors had admitted to having on their juror information forms, and not taint other jurors who had expressed no prejudgment of Howell's guilt. In fact, 37 of

96

the 59 jurors remaining for selection either responded that they had a relationship with the defendant, his family, the victim or his family, or had knowledge of the case, and in some cases the juror had formed an opinion. To require defense counsel to question jurors regarding their knowledge of Howell's criminal background, which had been discussed in local newspapers multiple times prior to the start of the trial, would have highly prejudiced Howell's chances of getting a fair and impartial jury.

¶234. This Court in *Carr v. State*, 655 So.2d 824, 842 (Miss. 1995), addressed the right of the defendant to conduct individual voir dire. The Court noted that under then existent Rule 5.05 of the Mississippi Uniform Criminal Rules of Circuit Court Practice, the defendant is granted the right to conduct individual voir dire at the discretion of the trial court. However, the trial court must be aware of the heightened publicity surrounding capital murder cases and the possibility, if not probability, of tainting unbiased jurors with information gained outside of the courtroom. The U.S. Supreme Court has noted the importance of the ability to individually voir dire members of the venire in *Sheppard v. Maxwell*, 384 U.S. 333, 362, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966), stating that the danger of general voir dire is that the panel members not only hear prejudicial information, but also learn the desired response to questions.

¶235. During voir dire, jurors repeatedly responded that they had knowledge of the facts of this case. To require the defendant to voir dire those jurors as to their knowledge of the defendant's previous criminal activity would contaminate the entire jury pool. Due to the persuasiveness of modern communication and the difficulty of erasing prejudicial publicity

from the minds of jurors, the trial court should have allowed sequestered voir dire to eliminate prejudice and prejudgment of a jury sitting in the trial of a capital murder case.

> *C. Allowing the State, in closing argument, to refer to Howell's failure to tell somebody about his alibi defense or give details.*

¶236.  The prosecution in closing arguments stated: "If you had an alibi and were accused of Capital Murder, don't you think you would tell somebody about it. Don't you think you would give some details. Done something, that is common sense."

¶237.  This Court noted in *Taylor v. State*, 672 So.2d 1246, 1266 (Miss. 1996), that the prosecution is prohibited from making a direct comment or reference by innuendo or insinuation to a defendant's failure to testify on his behalf.  The prosecution's statement in closing argument here can only be construed as a comment on Howell's failure to take the stand and give details concerning his alibi. Considering that the prosecution was well aware of the two witnesses who testified as to Howell's whereabouts supporting his alibi, the prosecution's argument can only apply to Howell.  In fact, the prosecution's use of the phrases "don't you think you would tell somebody, don't you think you would give some details", can, in my opinion, only be referring to Howell's failure to testify on his own behalf.

¶238.  Because these three errors deprived Howell of a fair trial, I would reverse the circuit court's judgment and remand this case for a new trial.

¶239.  It is for the foregoing reasons that I  respectfully dissent.

**McRAE, P.J., JOINS THIS OPINION.**

# APPENDIX

# DEATH CASES AFFIRMED BY THIS COURT

*Walker v. State,* 815 So.2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So.2d 934 (Miss. 2002).

*Stevens v. State,* 806 So.2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So.2d 241 (Miss. 2002).

*Knox v. State,* 805 So.2d 527 (Miss. 2002).

*Simmons v. State,* 805 So.2d 452 (Miss. 2002).

*Berry v. State,* 802 So.2d 1033 (Miss. 2001).

*Snow v. State*,  800 So.2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So.2d 192 (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,*  787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999).    *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

## **DEATH CASES AFFIRMED BY THIS COURT**

### **(continued)**

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

## DEATH CASES AFFIRMED BY THIS COURT

## (continued)

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

iii

*****Jones v. State**, 517 So. 2d 1295 (Miss. 1987**), *Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

# DEATH CASES AFFIRMED BY THIS COURT

## (continued)

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

   * Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

# DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE

*Flowers v. Sate,* 842 So.2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

# DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE
### (continued)

*Houston v. State*,  531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

**DEATH CASES REVERSED
AS TO PUNISHMENT AND REMANDED
FOR RESENTENCING TO LIFE IMPRISONMENT**

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. 1983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
## PUNISHMENT AND REMANDED FOR A NEW TRIAL
### <u>ON SENTENCING PHASE ONLY</u>

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

   *\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

   *\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

   *\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

   *\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

**DEATH CASES REVERSED AS TO**
**PUNISHMENT AND REMANDED FOR A NEW TRIAL**
**ON SENTENCING PHASE ONLY**
**(continued)**

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).  *  Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.